RUTH J. HOOPER, admx. *vs.* THE BOSTON & MAINE RAILROAD.

York.　Opinion January 18, 1889.

*Railroads. Crossings. Gates. Negligence. Stat. 1885, c. 377.*

Chapter 377 of the acts of 1885, prohibits a train running across a highway, near the compact part of a town, at a speed greater than six miles an hour, unless the parties operating the railroad maintain a flagman or a gate at the crossing.

When railroads elect to erect gates they must be tended, or they become false signals and lead travelers into the danger against which they are intended to guard them.

A collision at a railroad crossing is *prima facie* evidence of negligence on the part of the traveler; but such inference may be repelled. An open gate which invites passing, and an obstructed view, may be sufficient to bring the question of negligence within the province of the jury to decide, and prevent a nonsuit, or setting aside a verdict, if the jury find in favor of the traveler.

Where the verdict of a jury established the fact that the deceased, at the time of the accident, was deceived and misled, by the negligence of a railroad company in leaving their gates open, at a time when they should have been closed, the court refused to set the verdict aside.*

ON MOTION, by defendants to set aside the verdict as against law and evidence.

Action on the case to recover damages for injuries received by Daniel O. S. Hooper, plaintiff's intestate, through the negligence of the defendants in the running their train.

The facts alleged in the plaintiff's declaration and disclosed by the testimony in the case are as follows:

On the 26th day of November, 1886, the Boston & Maine Railroad was in possession of and operating a line of railroad known as the Boston & Maine Railroad, Western Division, moving cars and locomotives thereon by steam, its track being laid through a compact part of the city of Biddeford, crossing a public highway there known as Main street, at grade with said street.

At the Main street crossing, the defendant corporation had for several years, maintained a gate consisting of several arms, and by their employes were accustomed to lower the same across the street, upon each side of the crossing, upon the approach of trains along its line, and thereby warned and prevented travelers from attempting to cross its track when trains were approaching the crossing, and thereby the public and plaintiff's intestate were accustomed to receive notice from the defendant, that the passage could not be made, and that a train was approaching; and when the gates were raised up, they were notified that no trains were approaching, and that the passage across the track could be safely made.

Hooper lived about two and one-half miles from the post office in Biddeford, and at the time of his decease was forty-six years of

---

*See *State* v. *Boston & Maine Railroad,* 80 Maine, 440.

age, was in good health and a man of. excellent habits and of standing in the community where he dwelt. He was accustomed to go from his home to the city several times a week in the day-time, passing back and forth over the crossing mentioned, and presumably knew the uses, purposes and methods of operating the gate at the crossing.

There was also another line of railroad track, operated by the Boston & Maine Railroad, known as the Eastern Division, which crossed Main street about one thousand feet northerly from the crossing first mentioned.

At a distance of twenty-four hundred and forty-five feet westerly from the first crossing mentioned, the tracks of the Western and Eastern Divisions aforesaid are only about three hundred feet apart, and a few hundred feet further west the lines were only a few feet apart. At the point where these two roads diverged and where the locomotives whistled, both roads run through deep cuts.

On the night of the twenty-sixth of November, 1886, shortly after ten o'clock P. M., Hooper, in company with two of his neighbors, Benjamin and Burnie, was travelling along Main street on his way home from the city.

They were riding in an ordinary express wagon, drawn by a slow jogging horse, Hooper in the middle holding the reins, Benjamin on the left side and Burnie on the right. From the last of June, 1886, to the twenty-fourth of October, previous to the night last mentioned, the night Pullman train ran on the Eastern Division and was then changed to the Western Division, and passed this crossing about 10.15 P. M.

When Hooper, and his companions, were within about three hundred and forty feet of the crossing, they heard the whistle of a locomotive, and Hooper remarked that he could not tell on what road it was. That point, on Main street, was at a considerable elevation above the lines of both roads, and the lay of the land and the contiguity of buildings was such, it was claimed, as to conceal from view any trains moving on the tracks; and the echoes necessarily would affect one's judgment, in determining from the sound, on what road or from what direction the train was approaching.

As they descended the hill toward the crossing, they did not increase the speed of from three to four miles an hour at which they were driving, nor did they see any locomotive approaching, nor could they have seen any as they passed along, unless the train had been so near to the crossing, that it would have passed the crossing when they were at least one hundred and fifty feet away.

As they neared the crossing, a view up the track was completely shut off by a dwelling-house until they were within fifteen feet of the track. The arms of the gates were raised up and no gate man or flag man was in attendance, and nothing to give notice of any danger at this crossing, such as was usually given, and which Hooper and his companions were accustomed to see.

From the time the whistle was heard, when Hooper made his remark "that he did not know which division of the road it was on" no conversation took place as they rode slowly down the hill, but the three men were apparently expecting the train on the Eastern Division.

The only survivor of the three testifies that he was watching the gates and that they were not moved; that as they passed the building near the track, he saw the locomotive and said to Hooper "stop and back;" and he endeavored to do so, but they were too near, and the train struck the horse's head throwing Benjamin down the line some forty feet killing him instantly; Hooper was thrown against a gate post and was injured so much that he died in about half an hour; his horse was killed, the shafts of the wagon were broken, and Burnie thrown over back of the seat.

This train was running twenty to twenty-five miles an hour, and no one of the witnesses heard any bell ringing, and no evidence was offered by the defendant as to the rate of speed or the ringing of the bell, or the place where the whistle was sounded.

The jury returned a verdict for the plaintiff.

*G. C. Yeaton, B. F. Chadbourne*, with him, for defendants.

Plaintiff's intestate was owner and driver, in sole control of the carriage; he knew the uncertainty of attempting to cross. These facts distinguish this case from *State* v. *B. & M. R. R.*,

80 Maine, 430. Driver's relation to defendants different from that of passenger. *Dyer* v. *Erie R. R. Co.*, 71 N. Y. 228.

Intestate did not use all his available faculties. No pretense of inability both to look and listen, or that the exercise of these faculties would not have disclosed the coming train. No claim of any attempt whatever to use either.

The gates had been in use by day only. Burnie's irresponsive remark interjected that he was looking for the gates to close, is inconsistent with what he said to Hooper,—relating solely to the whistle. The jury thus transfer, without and against evidence, what Burnie was thinking of, to Hooper, and thus discover an excuse for his abandonment of all attempt to use ordinary faculties under critical circumstances. Neither had seen the gates lowered at night.

The question is not whether defendants were or not negligent, in not operating its gates by night; not whether erect gates, with an attendant, would authorize a conclusive presumption of safety in one attempting to cross; not how far unattended, erect gates, by day or night, would authorize any presumption;—but this, whether, at night, unattended, erect gates would authorize one with good ears and eyes, and a partially open view, who had seasonably heard the warning whistle of an approaching train, to attempt to cross the railroad, without first attempting to look and listen, when and where by so doing he could have seen and heard, and a verdict declaring him in the exercise of ordinary care, be sustained.

But this verdict says, "No, it is not necessary that the traveler use all his faculties when approaching a railroad crossing, at grade, with the highway he is traversing; he may use a part of them, or only a part of some of them, and, if defendants are at all in contributory fault, may recover of it." This is the doctrine of comparative negligence.

Argument, and authorities cited, by counsel, upon other points will be found in 80 Maine, at pp. 434–440. Counsel also cited *Cin. Ind. St. Louis & Chi. Ry. Co.* v. *Long,* 112 Ind. 166, 175, 176.

*W. F. Lunt, F. M. Higgins,* with him, for plaintiff.

The only ground in support of the motion, is contributory neg-

ligence on the part of Hooper, that he did not look and listen, &c. Looking for the train was useless, until within fifteen feet of it. The open gates led the party to believe the train was on the other road. The jury found the plaintiff did look and listen. The open gates induced the belief that he could safely continue on without interruption. *State* v. *B. & M. R. R.*, 80 Maine, 430, 444; 2 Woods Ry. Law, pp. 1316, 1319, 1328. A traveler may assume that the company will comply with the law. *Kennayde* v. *Pac. R. R. Co.*, 45 Mo. 255.

Flag man and false signals: *Sweeny* v. *Old Colony R. R.*, 10 Allen, 368, 377; *Newson* v. *N. Y. C. R. R. Co.*, 29 N. Y. 383; *Spencer* v. *Ill. Cen. R. R. Co.*, 29 Iowa, 55; *Webb* v. *P. & K. R. R.*, 57 Maine, 117, 135, 136; 2 Woods Ry. Law, p. 1314.

Hooper had the right to assume the whistle would sound at least one hundred rods from crossing, speed of train reduced to six miles per hour, and bell rung for eighty-five rods before reaching crossing.

Negligence cannot be conclusively inferred by the court, where different inferences may be fairly drawn, or upon which fair-minded men may reasonably arrive at different conclusions. *Brown* v. *R. R. Co.*, 58 Maine, 384; *Leson* v. *R. R. Co.*, 77 Id. 85, 91; *Shannon* v. *R. R. Co.*, 78 Id. 52, 60; *Snow* v. *R. R. Co.*, 8 Allen, 441; *Treat* v. *R. R. Co.*, 131 Mass. 371; *Peverly* v. *Boston*, 136 Id. 366; *Lawless* v. *R. R. Co.*, 136 Id. 1; *R. R. Co.* v. *Stout*, 17 Wall. 657, 663, 664.

Question of care: *State* v. *B. & M. R. R.*, *supra*; *Chaffey* v. *B. & L. R. R.*, 104 Mass. 108, 115; *Greany* v. *Long Island R. R.*, 101 N. Y. 419; *Sonier* v. *B. & L. R. R.*, 141 Mass. 10, 13; *Kelley* v. *St. Paul &c. R. R.*, 29 Minn. 1.

Gates: *Wanless* v. *N. Ea. Ry. Co.*, L. R. 6 Q. B. 481; *Stapley* v. *London &c. Ry. Co.*, L. R. 1 Ex. 21; *Kessinger* v. *N. Y. & H. R. R.*, 56 N. Y. 538, 543; and cases cited by court in *State* v. *B. & M. R. R.*, *supra*, at p. 444.

WALTON, J. This is an action to recover damages for injuries received by the plaintiff's husband at one of the railroad crossings in the city of Biddeford; and for which the plaintiff has obtained a verdict for $4650. The negligence of the defendant company

is not controverted. It is conceded that at the time of the accident it was running one of its night trains at a rate of speed more than four times that allowed by law, unless it closed its gates or kept a flagman at the crossing: and it did neither. The only question is whether the evidence submitted to the jury was sufficient to justify them in finding that the plaintiff's husband at the time of receiving the injuries was in the exercise of ordinary care. We think it was. We think the evidence was sufficient to justify the jury in finding that at the time of the accident the deceased was deceived and misled by the negligence of the railroad company in leaving their gates open at a time when they should have been closed.

The facts, briefly stated, are these: The plaintiff's husband and two other men were riding together in a wagon. It was about ten o'clock in the evening of Nov. 26, 1886. As they approached the railroad crossing they heard the sound of a locomotive whistle. Their view was obstructed and they could not see the approaching train. And at that point the tracks of the Boston & Maine & Eastern Railroads run quite near together. This left them in doubt as to which road the train was on. And in this state of uncertainty, they approached the crossing,—slowly and silently, and probably both looking and listening,—and finding the gates open, which they had been accustomed to see closed when a train was about to pass, they became satisfied that the train was on the other road, or so far away as not to be a source of danger, and they attempted to cross, when the night Pullman train rushed down upon them, and one of the men was instantly killed, another hurt, and the plaintiff's husband so injured that he died in half an hour.

The open gates were the direct and efficient cause of this accident. It was not the failure of the deceased to look and listen. We have no doubt that he and his companions did both look and listen; for they heard the whistle and they saw the open gates. We are satisfied that they did not see the approaching train, and for the reason that their view was so obstructed that they could not see it. If the gates had been seasonably closed, as they should have been, this accident would not—it could not—have happened.

The rate of speed at which the train was moving, made it the duty of the railroad company to close their gates or have a flagman at the crossing. The law forbids the running of trains across a highway, near the compact part of a town, at a rate of speed greater than six miles an hour, unless gates or flagmen are maintained. Act, 1885, c. 377. This train was running at the rate of twenty-five miles an hour. The gates had been used during the day, and until a train which was due at a little before eight o'clock in the evening, had passed. The gate tender then went home leaving the gates open. In his absence this night train passed. He returned at a little past ten o'clock, and found the team smashed, the horse and one man dead, another man hurt, and the plaintiff's husband dying,—the result of negligence in omitting to perform a plain statutory duty.

The statute cited does not compel railroads to erect gates at their crossings. They can reduce the speed of their trains to six miles an hour, and then neither flagmen nor gates will be necessary. But when they run their trains as this train was run, the law requires them to maintain gates or keep flagmen at the crossings. And when they elect to erect gates, clearly the gates must be tended, or they become false signals and lead the traveler into the very danger against which they were intended to guard him. Open gates invite passing. Closed gates forbid passing. And by these signals thousands of travelers are governed every day. And as gatemen usually perform their duties with fidelity—as much so as conductors, or engineers, or switchmen—we think it would be a wrong to them as well as to travelers to hold that every one who trusts them is guilty of a want of ordinary care. It would not be true. Ordinarily, the great mass of the community do trust them. And so far as we can discover, it has never been held by any court that to trust them is a want of ordinary care. The contrary has been held in many cases. A collision at a railroad crossing is *prima facie* evidence of negligence on the part of the traveler. But the inference of negligence may be repelled. And we think that an open gate and an obstructed view may be sufficient for this purpose. Certainly, they are sufficient to bring the question within the province of the jury to

decide, and prevent a nonsuit, or the setting aside of the verdict, if the jury find in favor of the traveler. But as this precise question has already been considered by the court, in an action relating to this same accident; and the circumstances attending it, and the authorities bearing upon the questions of law involved in it, very carefully and fully examined in an opinion by the Chief Justice, we shall not pursue our inquiries further. It is sufficient to say, in conclusion, that we are not satisfied that the verdict is wrong,—certainly not so clearly wrong as to require us to set it aside and grant a new trial, See opinion of the court, above referred to, in *State* v. *Boston & Maine Railroad*, 80 Maine, 440, (6 N. E. R. 777).

*Motion overruled.*

PETERS, C. J., DANFORTH, VIRGIN, EMERY and HASKELL, JJ., concurred.