[S. F. No. 15280. In Bank.—April 30, 1935.]

CLAUDE L. CRAWFORD, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

Harold D. Durst and Roy G. Hillebrand for Appellants.

Fred A. Watkins and Edmund J. Holl for Respondent.

THE COURT.—Defendants appeal from a judgment in favor of plaintiff received in an action growing out of a collision between a locomotive operated by defendant company, and a truck operated by plaintiff. The major contention of defendants is that although the evidence clearly establishes their negligence, the evidence, as a matter of law, also establishes plaintiff's contributory negligence.

In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Treadwell* v. *Nickel,* 194 Cal. 243 [228 Pac. 25]; *Bancroft-Whitney Co.* v. *McHugh,* 166 Cal. 140 [134 Pac. 1157]; *Wing* v. *Kishi,* 92 Cal. App. 495 [268 Pac. 483].) To establish the defense of contributory negligence as against the verdict of a jury, the evidence must be such that the appellate court can say that there is no substantial conflict on the facts, and that from the facts reasonable men can draw but one inference, which inference points unerringly to the negligence of the plaintiff proximately contributing to his own injury. (*Green* v. *Southern Pac. Co.,* 53 Cal. App. 194 [199 Pac. 1059]; *Carey* v. *Pacific Gas & Elec. Co.,* 75 Cal. App. 129 [242 Pac. 97]; *Wing* v. *Western Pacific R. R. Co.,* 41 Cal. App. 251 [182 Pac. 969].)

Keeping these well-settled rules in mind we turn to a review of the evidence.

The accident occurred on November 14, 1931, at about 2:40 P. M., at a railroad crossing located on Third Street

just north of the intersection of that street with Sixteenth Street in the city of San Francisco. On the day in question it had been raining intermittently, but it was not raining at the time of the accident. Plaintiff, at the time, was driving a White truck, heavily loaded with several hundred boxes of apples. Early in the morning of November 14th, he had started from Watsonville, and at the time of the collision was proceeding north on Third Street towards his employer's warehouse. The railroad crossing consists of two parallel sets of tracks which cross Third Street on an angle. The locomotive involved was of a type known as a "switch engine", and it was proceeding in a westerly direction on the north set of tracks, that is, on the tracks farthest from respondent. The locomotive was drawing three loaded cars across Third Street. Third Street, at the crossing and for some distance on either side thereof, is nearly 70 feet wide, the westerly 33 feet being paved with asphalt, the balance being paved with cobblestones. Automobile traffic in both directions customarily uses the asphalt portion of the street. Just beyond the cobblestone portion of Third Street, and paralleling the street on the east side is an overpass used by street cars to cross the railroad tracks at this point. On the westerly side of Third Street, north of the tracks is a flagman's shanty wherein the flagman whose duty it is to warn of approaching trains stays when his duties do not call him into the street.

According to the testimony of the respondent, and of two disinterested witnesses, on the day and at the time of the accident, there were two or three box cars of appellant railroad company spotted on the south track, that is on the track closest to respondent as he approached the crossing. One box car projected out into the cobblestone portion of Third Street for a distance of about eighteen feet. These box cars extended under the overpass. This fact, together with the fact that some lumber was piled along the railroad right of way on the east side of Third Street, made it impossible for one approaching the crossing from the south to see around the end of the last box car. These box cars were stationary and not connected to a locomotive. They were so located that the view of one going north on Third Street was so obstructed that it would be impossible to see a train approaching from the east until such person was within about twenty feet of the crossing.

Several of appellants' witnesses testified that no such box cars were on the south tracks, but it is significant that one of the appellants, the fireman on the locomotive, admitted such cars were there, but contended they were back under the overpass. The two disinterested witnesses produced by respondent not only testified the box cars were there as testified to by respondent, but also testified that within fifteen or twenty minutes after the accident such cars were moved back under the overpass.

The evidence is without conflict that a flagman is customarily present at the crossing in question. Respondent had traveled on Third Street on many occasions prior to November 14, 1931, and was thoroughly familiar with the fact that a flagman was stationed there. Respondent testified that on every occasion he had passed the crossing prior to November 14th, the flagman had been present to warn of the approach of trains. The testimony further shows that it was the habit of the flagman to warn of the approach of trains by standing on the north side of the tracks in the middle of the asphalt portion of Third Street and waving the usual hand signals.

Respondent testified, and we are bound by his testimony, that at the time of the accident there was no flagman at the crossing to warn of the approach of the train. It is true that several of appellants' witnesses testified that the flagman was in his customary place waving his signaling devices, but it is of some significance that one of the appellants, the engineer on the locomotive, who was sitting in the north side of the cab, and whose view of the crossing, and particularly the north side thereof, was unobstructed up until the moment of impact, and who testified that immediately prior to the accident he was looking ahead, stated he did not see any flagman at the crossing, although he had seen him there when he had passed over the crossing on a different trip some thirty minutes before the accident. For the purposes of this appeal, we must, therefore, assume that although the flagman was customarily maintained at the crossing he was not there at the time of the accident.

Respondent, as already stated, was proceeding north on Third Street. He testified that his truck was equipped with a governor so that he would not go faster than 25 miles per hour when the truck was loaded; that as he approached the crossing he noticed another truck in front of

him about 150 feet distant traveling also in a northerly direction; that as the truck ahead came to the crossing it slowed down whereupon respondent also slowed down to about 15 miles per hour; that when he was about 150 feet from the crossing he put the car into "third", the truck having four speeds; that he looked to see if the flagman was there to signal the approach of a train; that the flagman was not there; that he looked for any signs of an approaching train; that there was nothing at all—no signs —to indicate the approach of any trains; that he heard no bell or whistle signaling the approach of a train; that his vision was good and he was looking ahead; that he observed the box cars on the south track protruding out into Third Street; that the box cars obstructed his view of the north track to the east, but that directly ahead there were no obstructions to his view, that when he saw the box cars he looked toward the end of the string but he could not see the other end, the cars going under the overpass and the lumber obstructing his view; that the box cars were stationary and he was watching them; that he observed the truck ahead of him slow down as it approached the crossing; that he slowed down and put the truck into "third"; that (from all the circumstances above mentioned) he "presumed the crossing was clear"; that he had his hand on the gear shift preparatory to shifting back into high gear when he observed the train approaching from in back of the box cars at an approximate speed of 15 miles per hour; that he slammed on the emergency brake and stood upon the foot brake; that the truck was equipped with air brakes; that he slowed down the truck until it was almost stopped at the time of the collision; that just before the collision he observed two men standing on the front of the locomotive; that he was afraid to swing to the left for fear of hitting the two men; that he observed the back of the head of the fireman in the cab; that the fireman was not looking in his direction.

Under such circumstances the truck and locomotive came into collision, the front corner of the truck coming into contact with the front corner and side of the locomotive. The truck was overturned and caught fire. As a result of the collision the respondent suffered the severe injuries hereafter referred to.

The evidence as to respondent's speed just before the impact is not clear. The evidence is capable of the interpretation that when respondent was within 150 feet of the crossing he slowed down to 15 miles per hour and that he maintained that speed until he was within 50 feet of the crossing. He apparently then slightly increased his speed, preparatory to changing gears, to between 15 and 18 miles per hour. The Motor Vehicle Act, section 113, provided for a 15 mile speed limit over railroad crossings where the view is obstructed. Assuming that respondent was slightly exceeding that rate and was therefore guilty of negligence *per se*, whether such negligence proximately contributed to the accident was of course a question of fact to be determined by the jury. (*Baillargeon* v. *Myers*, 180 Cal. 504 [182 Pac. 37]; *Langford* v. *San Diego Elec. Ry. Co.*, 174 Cal. 729 [164 Pac. 398]; 19 Cal. Jur. 734, sec. 140.)

The engineer of the locomotive testified that he was on the north side of the cab; that he was looking ahead and did not see the flagman at his customary place; that there was nothing to obstruct his view of the intersection; that approaching the intersection the train was proceeding at between 6 to 8 miles per hour; that when the front of the locomotive was within 60 feet of the asphalt portion of Third Street, the fireman yelled, "hold 'em", railroad parlance for putting on all brakes; that the train moved at least 60 feet before the collision and some few feet thereafter.

From the above *résumé* it is apparent that the negligence of the railroad company was clearly shown. The absence of the flagman from his place of duty, the obstructing the view and the failure to ring the bell all constitute negligence which the jury was justified in finding constituted the proximate cause of the injury. As we understand appellants' position, they do not question the sufficiency of the evidence to show their negligence, but contend that respondent failed to show that he took reasonable precautions in approaching the crossing and that his own evidence shows that he was guilty of contributory negligence as a matter of law. Appellants rely on the familiar rules emphasized in such cases as *Koster* v. *Southern Pac. Co.*, 207 Cal. 753 [279 Pac. 788], *Koch* v. *Southern California Ry. Co.*, 148 Cal. 677 [84 Pac. 176, 113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521], *Baltimore & Ohio Ry. Co.* v. *Good-*

*man,* 275 U. S. 66 [48 Sup. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645], *Southern Pac. Co.* v. *Day,* 38 Fed. (2d) 958, and many other cases, that a railroad crossing is of itself a place of danger and is a warning of danger and that even in the case of a guarded crossing, the traveler on the highway is not released from the duty of exercising due care for his own safety, and cannot, without regard for his own safety, blindly rely on the absence of the flagman, and treat such absence as a warranty that no train is approaching. Those cases and many others cited by appellants, undoubtedly hold that the absence of the flagman or other evidence of warning, is not of itself, sufficient to permit one injured in a collision at such a crossing to recover—he must show that he acted as a reasonably prudent man would act under all the circumstances and took reasonable precautions for his own safety. However, the cases recognize that the *quantum* of care required of one approaching a guarded crossing is much less than that required of a person approaching an unguarded crossing. The principles involved in the present case were clearly stated by this court in *Gregg* v. *Western Pac. R. R. Co.,* 193 Cal. 212, 221 [223 Pac. 553]. In that case, involving a guarded crossing, the trial court granted a nonsuit. As in the present case the flagman was absent from his place of duty and no bell or other signal was given by the approaching train. The plaintiff's view of the approaching train was obstructed. In reversing the decision of the trial court, Justice Seawell, speaking for the court, stated: ''Respondent places much reliance upon what is said in the case of *Jones* v. *Southern Pac. Co.,* 34 Cal. App. 629 [168 Pac. 586], to sustain the judgment of nonsuit. There the rule of *Chrissinger* v. *Southern Pac. Co.,* 169 Cal. 619 [149 Pac. 175], and *Griffin* v. *San Pedro, L. A. & S. L. R. Co.,* 170 Cal. 772 [151 Pac. 282, L. R. A. 1916A, 842], to the effect that: 'Where the standard of conduct is so obvious as to be applicable to all persons and the plaintiff has failed to measure up to that standard, under the circumstances shown, he is not entitled to have his case go to the jury' is restated. It is true that that case involved as an element the question of an absent flagman. But the facts of that case are not the facts of this case. The elements which make up the case now before us and which have been stated were not present in *Jones* v. *Southern*

*Pac. Co., supra.* There the view of the plaintiff was unobstructed and for a distance of 30 feet from the nearest rail of the track he had a plain view of defendant's train and his conduct under the simple circumstances of the case was inexcusable. If he had looked at all he would have seen the peril into which he was blindly driving. Other opportunities of protection were open to plaintiff in that case which are not shown in the present case. We do not here hold that one who blindly attempts to cross a steam railroad track, whether the crossing be guarded or unguarded, and by reason of such negligence is injured by being hit by a passing train has a cause of action against the railroad company. The law casts upon everyone the duty of exercising such care as is commensurate with the situation. The question is as to the *quantum* of care that was required to be exercised by appellant in the instant case.

"It is true, as has often been stated that a railroad crossing is itself a place of danger and is an effectual warning of danger which must always be heeded and the exercise of ordinary care in traveling over such place is not excused by the negligent omission of the railroad company itself to exercise reasonable care. But it is also true that a railway company will not be permitted to encourage the public to relax its vigil as to the dangers that lurk in railroad crossings by assurances that the danger has been removed or minimized by the adoption of safety devices and measures and at the same time hold a person to the same *quantum* of care as if no such safety measures had been provided. In *Koch* v. *Southern Cal. Ry. Co.*, 148 Cal. 680 [84 Pac. 176, 113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521], it is said that the adoption of safety gates or any other appliances by a railroad company for the protection of the public does not absolve the public from all duty of taking care of itself. 'A person is still required to exercise due and ordinary care, and while the *quantum* of care which will be reasonable may be *less* where the gates are provided and relied upon by the traveler, still the gates themselves are not an assurance and a warranty *such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions,* as did the plaintiff in this instance.' (Italics ours.) Continuing it quotes the following from *Ellis* v. *Boston, etc. R. R. Co.*, 169 Mass. 600 [48 N. E. 839]:

'The raising of the gates was, no doubt, a circumstance which justified the plaintiff in starting to cross the railroad when he did, and he had a right to expect that if any engine or train was approaching the crossing on the inbound track, a whistle would be sounded or a bell be rung. But in attempting to cross the railroad he was bound in the exercise of ordinary care to himself exercise his own powers of observation, and to take thought for his own safety; and he was not entitled to have his case go to the jury unless there was evidence from which it could be inferred that he did this. . . . While the raising of the gates justified the plaintiff in attempting to cross when he did, and while that fact and the facts that no whistle was sounded and no bell was rung are to be taken into consideration on the question of how much he must himself look and observe as he makes his way across, these circumstances do not excuse him from looking and listening and taking thought for his own safety. He cannot rely wholly upon them, and cannot recover without showing more as to his own conduct than that he so relied.' . . .

"If a reasonably prudent person situated as appellant was situated, and seeing what he then saw and knew would have been justified in acting upon appearances as appellant assumed to do, or, if reasonably prudent men would disagree as to whether appellant exercised ordinary care in the premises, then the case should have gone to the jury. The invitation to cross, the failure to ring the bell or sound the whistle, as required by the provisions of section 486 of the Civil Code, are elements which must be considered with all the other facts and circumstances of the entire case. The case of *Koch* v. *Southern Pac. Co.*, *supra*, is not inconsistent with anything said in *Wyseur* v. *Davis, as General-Director of Railroads*, 58 Cal. App. 598 [209 Pac. 213]. The rule is there correctly stated to be: 'In discussing a similar question, the absence of a flagman from a crossing, in the case of *Elias* v. *Lehigh Valley R. Co.*, 226 N. Y. 154 [123 N. E. 73], it is said: "The danger is obvious. It is like in kind to that caused by raised and untended gates. To some extent it is an assurance that the way is safe. That the railroads recognize the danger is seen by the familiar sign at country crossings giving notice that the flagman is absent after 6 P. M." (See, also, *Washington* v. *Birmingham Southern R. Co.*, 203 Ala. 295 [82 So. 545].) Where

operated during certain hours of the day only, open gates during the remainder of the day give the same assurance of safety to persons without knowledge of the limited operation thereof as if there were no such limitation, in the absence of reasonable notice by appropriate signs or otherwise. ''Whether required by statute or not, the fact that the gate is open is held to be an invitation to cross and an assurance that the track can be crossed in safety.'' (Elliott on Railroads, 2d ed., sec. 1157; *State* v. *Boston etc. R. R. Co.*, 80 Me. 430 [15 Atl. 36]; *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Tatman*, 72 Ind. App. 519 [122 N. E. 357]; *Washington* v. *Birmingham Southern R. Co., supra; Montgomery* v. *Missouri Pac. Ry. Co.*, 181 Mo. 477 [79 S. W. 930]; *Schwarz* v. *Delaware, L. & W. R. Co.*, 211 Pa. 625 [61 Atl. 255].) ''Open, they proclaim safety to the passing public; closed they proclaim danger.'' (*Baltimore & P. R. Co.* v. *Landrigan*, 191 U. S. 461 [24 Sup. Ct. 137, 48 L. Ed. 262], see, also, Rose's U. S. Notes.) ''By these signals thousands of travelers are governed every day.'' (*Hooper* v. *Boston & M. R. Co.*, 81 Me. 260 [17 Atl. 64].) An open gate ''is in the nature of an invitation to cross, and a declaration that there are no approaching trains''. (*Pennsylvania R. Co.* v. *Stegemeier*, 118 Ind. 305 [20 N. E. 843, 10 Am. St. Rep. 136].) See, also, *Delaware & H. Co.* v. *Larnard*, 161 Fed. 520, 88 C. C. A. 462; *Louisville & N. R. Co.* v. *Eckman*, 137 Ky. 331 [125 S. W. 729]; *Carlin* v. *Michigan Cent. R. Co.*, 189 Ill. App. 23; *Lake Erie & W. R. Co.* v. *Howarth*, 73 Ind. App. 454 [127 N. E. 804].)'

''The extent to which a traveler may rely upon the assurance of safety arising from the absence of a flagman from his post of duty on the presumption that it is safe for him to cross a railroad track which he is familiar with is generally held to be a question of fact for the jury. (33 Cyc. 1027; Elliott on Railroads, sec. 1651.)

'' 'It has often been said by this court that it is very rare that a set of circumstances is presented which enables a court to say, as a matter of law, that negligence has been shown. As a general rule, it is a question of fact for the jury, an inference to be deduced from the circumstances of each particular case, and it is only where the deduction to be drawn is inevitably that of negligence that the court is authorized to withdraw the question from the jury.' (*Hoff*

v. *Los Angeles Pacific Co., supra* [158 Cal. 596, 112 Pac. 53], quoting from *Sellers* v. *Market St. Ry. Co.,* 139 Cal. 268 [72 Pac. 1006].)'' See, also, *Ogburn* v. *Atchison etc. Ry. Co.,* 110 Cal. App. 587 [294 Pac. 491]; *Cain* v. *Davis,* 55 Cal. App. 565 [203 Pac. 807]; *Gregoriev* v. *Northwestern Pac. R. R. Co.,* 95 Cal. App. 428 [273 Pac. 76].

In *Robbins* v. *Southern Pac. Co.,* 102 Cal. App. 744, 750 [283 Pac. 850], the trial court had also granted a nonsuit in a guarded crossing case. In the Robbins case the view was, as in the instant case, obstructed by box cars. The flagman was actually in his customary place to give warning of the approaching train with two lighted lanterns, which however he held ''back of his legs''. In reversing the judgment of nonsuit the court stated: ''On the other hand, it is equally well settled that the duty to stop, look and listen is not an absolute one but rather one the exercise of which is dependent on the particular conditions obtaining at the time (*Hoffman* v. *Southern Pac. Co.,* 101 Cal. App. 218 [279 Pac. 474, 281 Pac. 681]; *Whitney* v. *Northwestern Pac. R. R. Co.,* 39 Cal. App. 139 [178 Pac. 326]), and that 'if there is reasonable cause to believe there is no danger it is not negligence *per se* not to stop, look or listen'. (*Wilkinson* v. *United Railroads,* 195 Cal. 185 [232 Pac. 131, 135].) In the case just cited it is also held that one of the circumstances which will excuse a failure to look and listen is 'where one has entered on the crossing under an express or implied invitation of safety'. Such assurance of safety may consist of raised traffic bars, of open gates where such devices are maintained at crossings or of the absence of a watchman or flagman at a crossing where one is usually stationed when trains are approaching. (*Wyseur* v. *Davis,* 58 Cal. App. 598 [209 Pac. 213]; *Gregg* v. *Western Pac. R. R. Co.,* 193 Cal. 212 [223 Pac. 553]; *Pennsylvania R. R. Co.* v. *Stegemeier,* 118 Ind. 305 [20 N. E. 843, 10 Am. St. Rep. 146]; *Elias* v. *Lehigh Valley R. R. Co.,* 226 N. Y. 154 [123 N. E. 73]; *Hooper* v. *Boston & Maine Ry. Co.,* 81 Me. 260 [17 Atl. 64].)

''*Pennsylvania R. R. Co.* v. *Stegemier, supra,* which is cited and relied on in *Wyseur* v. *Davis, supra,* was a case where a pedestrian attempted to cross a railroad track over a public street in the city of Fort Wayne. The gates were open at the time and the flagman was in his shed, but he gave no warning. It was held that under the circumstances

it could not be said, as a matter of law, that the pedestrian was guilty of contributory negligence in attempting to cross without taking the precautions usually required to discover approaching trains, and the court said: 'The case at bar is to be discriminated from those in which the injured person enters upon a track where there is no affirmative assurance of safety, for here the fact that the gates were up and no warning given by the flagman was an affirmative assurance of safety, upon which a citizen might act without being chargeable with negligence. This case is essentially unlike one where the only negligence is the mere failure to sound a whistle or ring a bell, for here the assurance was that there was no train near the crossing. This assurance constitutes the distinctive feature of this class of case, for the reason that it is in the nature of an invitation to cross and of a declaration that there are no approaching trains.'

"In the final analysis the test of negligence, as applied to one about to cross a railroad track the view of which is obstructed, should be: Would a reasonably prudent person, situated as the individual under consideration was situated and seeing what he then saw, have been justified in acting upon appearances as it may be assumed he did? If reasonably prudent men might disagree as to whether ordinary care was exercised in the premises the question should be left for the jury to determine (*Hoffman* v. *Southern Pac. Co., supra; Gregg* v. *Western Pac. R. R. Co., supra*)."

We think the reasoning of the two quoted cases and the cases cited therein is clearly applicable to the facts of the present case. The absence of the flagman from his customary position and the failure to sound a warning, under the circumstances here disclosed, constituted an implied invitation to cross and an assurance that no trains were approaching. We do not mean to hold that one approaching a crossing can blindly rely on the presence or absence of a flagman or failure to hear a bell or whistle without further regard to his own safety. Knowing he is approaching a point of possible danger he must exercise reasonable care. If the approaching train is visible, he must look for it, or if it sounds a proper warning, he must hear it, and failure so to do will constitute contributory negligence. But here the railroad company by spotting the box cars on the south track so that they completely obscured the view to the east and in failing to sound a warning and

in failing to have the flagman present created what can aptly be referred to as a trap. By its actions the railroad company impliedly invited respondent to cross, assured him no train was approaching, parked its cars so he could not see, and now contends that by relying on the apparent appearance of safety created by it, he was guilty of contributory negligence as a matter of law. The respondent saw everything a reasonably prudent man would have seen. He kept a lookout ahead and he looked to the right towards the box cars. He looked for the flagman. He heard no whistle or bell. He did not and could not see the train until it was too close to avoid the collision. Under such circumstances we are of the opinion that the question as to whether respondent acted as a reasonably prudent man would have acted under the circumstances was one properly left to the jury.

■ Appellants also urge that the damages awarded are excessive. The jury awarded respondent $15,000. His special damages for hospitalization and medical care amounted to $1879. At the time of the trial, seventeen months after the injury, he was still unable to work at his chosen business. At the time of the accident his weekly wage was $40. Several doctors testified as to the serious nature of his injuries. He suffered compound comminuted fractures of both legs. The left tibia was broken into eight pieces and so crushed that the blood supply was partially cut off therefrom necessitating the tibia being wired together. His right tibia and fibula were also broken in several places. Several operations have already been performed on his legs, and one, and possibly two more operations will have to be performed. At the time of trial he was totally disabled from performing any work of the nature formerly performed. Some disability will be permanent. He suffered considerable pain and suffering. He was burned and suffered other cuts and bruises. In our opinion the damages are not excessive.

The judgment appealed from is affirmed.