JOHN HACKETT *vs*. MAINE CENTRAL RAILROAD COMPANY.

Androscoggin.    Opinion, August 28, 1946.

*Clifford & Clifford,* for plaintiff.

*Perkins, Weeks & Hutchins,* for defendant.

SITTING: THAXTER, HUDSON, MANSER, JJ., AND CHAPMAN, Active Retired Justice.
CHAPMAN, Active Retired Justice, dissents.

THAXTER, J.    The plaintiff, while driving his automobile over the Court Street railroad crossing in Auburn, collided with a train of the defendant proceeding northerly through the crossing. He has brought an action to recover for personal injuries and for damage to his car. After a verdict for the plaintiff, the case is brought before us on the defendant's motion for a new trial.

The main line of the Maine Central Railroad Company crosses Court Street at grade. Court Street, running east and west, is a

wide and busy thoroughfare; and the crossing is protected by gates which were operated by a gate tender during the entire twenty-four hour period. On the southerly side of the street and close to the crossing is a building which obstructs the view of the tracks in a southerly direction. One proceeding easterly and approaching the crossing, particularly when driving on the right hand side of the street as the plaintiff was doing, can see the tracks southerly but a short distance until practically on the railroad right of way. The gates are located approximately on the line of the easterly wall of the building above mentioned. The distance from the line of the gates to the point on the main line tracks where the accident took place is approximately fifty-five feet, and before coming to the main track the traveler going toward Lewiston, as the plaintiff was doing, must cross a spur or side-track.

The plaintiff was born in Auburn, had lived there all his life, for many years had been employed by the Androscoggin Mills in Lewiston, and at the time of the accident was the office manager of that company. He was thoroughly acquainted with the crossing in question. As a matter of fact he testified that he went down Court Street every day on his way to work and had been doing so for a good many years. About half past six in the morning on January 20th, 1945, he was driving on Court Street toward Lewiston to his work. There was considerable snow. As he approached the crossing, proceeding at a rate of ten or fifteen miles per hour, he noticed that the gates were up, and without stopping, but looking according to his testimony each way on the tracks insofar as conditions permitted him to see, started over the tracks. When he had crossed the first track he heard the roar of a train coming from the south. He attempted to stop but before being able to do so was struck either by the tender of the locomotive or by the baggage car and suffered the personal injuries and the property damage for which he now seeks to recover. The train proceeded on its way without any of the crew knowing of the accident. The train was a special and the gate tender was ap-

parently unaware that it was to be expected. At the time he was sweeping snow from the flange of the main line track. He saw the train when it was six or seven hundred feet away, dropped his broom, and ran to lower the gates; but it was too late to stop the plaintiff, who had proceeded so far that he did not even see the gates being lowered. The evidence is in conflict whether the headlight on the locomotive was lighted and the whistle sounded. The plaintiff testified that he did not see the light or hear the whistle. He heard the roar of the train and then saw the driving wheels of the engine.

On these facts there was ample evidence to justify the finding of the jury that the defendant was negligent. In fact the defendant does not seriously contend otherwise. It bases its claim for a new trial on the ground that the plaintiff was contributorily negligent as a matter of law.

The plaintiff's negligence must be based either on the fact that he did not stop, look, and listen before proceeding to cross the tracks, or that he did not take proper precautions to stop his car, when, after starting to cross, he should have seen the train.

The facts of this case are very similar to those in the cases of *State* v. *Boston & Maine Railroad,* 80 Me., 430, 15 A., 36; *Hooper* v. *Boston & Maine Railroad,* 81 Me., 260, 17 A., 64, and *Borders* v. *Boston & Maine Railroad,* 115 Me., 207, 98 A., 662, Chief Justice Peters said in the first case, page 444,

"If the presence of a flagman and closed gates indicate a passing train, certainly the absence of the flagman and open gates must be evidence that a train is not presently due or expected."

And in the second case the court, discussing in a civil action the same facts as in the first case, laid down the rule that reliance on an open gate is not a want of due care. In the *Borders* case, supra, Chief Justice Savage further amplified the rule and laid down what we must hold is still the law. He points out that it is the law in Maine that the attempt to cross a railroad track without look-

ing and listening for an oncoming train is negligence. He then discusses to what extent this rule should be modified if a flagman, who should be present to warn of an approaching train, is absent. And of course the same rule applies to a gate tender who is not performing his duties. The court points out that there are three separate views each supported by decisions in different jurisdictions. The first is that the traveler has the absolute right to rely on the absence of the flagman and can assume that no train is approaching. The second is that the traveler has no right to assume that the absence of the warning signal is an assurance of safety. The third or modified rule which is adopted as the law in Maine is that the traveler in spite of the absence of the flagman is bound to exercise "the care that ordinarily prudent persons might have exercised under like circumstances" and that whether this has been exercised is a question of fact for the jury. The court says, page 213:

"The modification that the traveler may rely to some extent upon the absence of the flagman removes the case from the class of negligence *per se* cases. It makes it a question of fact whether the traveler in view of all the circumstances, including the absence of the flagman, was in the exercise of ordinary care."

In reliance on these cases we must hold that it was a question of fact for the jury to decide whether this plaintiff in entering the railroad crossing as he did was in the exercise of due care.

When he came to the line of the gates there was a distance of fifty-five feet to the main line of the railroad where the collision took place. At ten miles per hour he would cover this in a little over three seconds, at fifteen miles an hour in two seconds and a half. During that time he had two ways to look to see what was approaching, to formulate a decision in his mind as to what he should do, and then, if the train was too near, to act to bring his car to a stop. His failure under these circumstances to stop be-

fore reaching the main track cannot be regarded as negligence as a matter of law. It was a question of fact for the jury.

We feel that the damages awarded by the jury are clearly excessive. It is stipulated that the damages to the car were $1,000. The evidence of the personal injuries suffered by the plaintiff is meager. He had some minor bills, but he lost no substantial time from his work. He complained of some soreness being present even at the time of the trial. We think that $1,000 for his personal injuries in addition to payment for the damage to his car will amply compensate him.

> *New trial granted unless the plaintiff will remit all of the damages awarded in excess of $2,000 within thirty days after filing of rescript.*

CHAPMAN, A. R. J., dissenting.

As to the conclusion of the three justices writing and concurring in the above opinion that the jury erred in the finding as to the damages, I am in agreement. The plaintiff, after the accident, went to his place of employment and lost no time therefrom on that day or thereafter. He made one visit to his personal physician and had three osteopathic treatments. His medical bills were $20.50. By stipulation, the damage to his automobile was $1,000. The jury's award of damages was $3,108.40. Therefore, $2,108.40 was for his personal injuries inclusive of medical bills. The three majority justices found that the jury's decision in this respect was so excessive that it was error as a matter of law. In other words, in stating the maximum damage to which the plaintiff was entitled, they feel that the jury awarded more than double the amount that a reasonable man would award.

I believe that the mental state present when the damages were assessed was also present when liability was passed upon. I believe that the conclusion reached was contrary to principles es-

tablished by this and other courts; and I therefore nonconcur in the opinion sustaining the finding upon liability.

I realize that it is not important to record my personal difference of opinion with the other justices, but I regard it of importance that the principles upon which the decision depends and which principles have been carefully and emphatically laid down in the cases subsequent to the three cases cited by the majority decision should be stated. I refer to the precautions prescribed by the court as necessary to the traveler in approaching a railroad crossing when the gates or other warning device thereon are not in operation. As authority for the care required in such situation I cite *Hesseltine* v. *Railroad Company*, 130 Me., 196, 154 A.; 264; *Johnson* v. *Terminal Co.*, 131 Me., 311, 162 A., 518; and *Witherly* v. *Bangor & Aroostook Ry.*, 131 Me., 4, 158 A., 362.

In consideration of the present case, it should be kept in mind that the plaintiff was not "trapped" on a blind crossing and cut down by a fast moving train, as was the situation described by the court in *Borders* v. *Boston & Maine Railroad*, 115 Me., 207, 98 A., 662, cited in the majority opinion; and likewise in *Hooper* v. *B. & M. R. R.*, 81 Me., 260, 17 A., 64, and *State* v. *B. and M. R. R. Co.*, 80 Me., 430, 15 A., 36, also cited and relied upon by the majority opinion. Rather it was a motorist driving at a leisurely pace—10 to 15 miles per hour according to the testimony—and running into the side of one of the cars of a train traveling at a moderate rate—15 to 20 miles per hour—which had passed in front of him the length of a modern locomotive and its tender on a lighted crossing and in the full glare of his automobile headlights,—the approach to which crossing was unobstructed from a point 55 feet from the track.

Mr. Thompson, in his *Commentaries on the Law of Negligence* (2nd ed.), Volume II, Section 1672, makes the following comment:

"But there is not much room for a difference of judicial opinion, where the traveller, with a courage that the Wan-

dering Jew displayed when he parted his coat tails and received a shower of grape-shot at close range at the Battle of Wagram, or that Dagobert displayed when he rode upon a row of broken bottles,—quietly walks, runs or drives against a moving train, contributory negligence being conclusively imputed to him."

In a footnote he apologizes for giving citations:

"It is an amazing commentary upon human nature that the books present such cases; but here they are."

As already suggested in the three cases cited in the majority opinion, the controlling facts were a blind crossing and a fast moving train. In the *Borders* case, supra, chiefly relied upon, the view of the driver was obstructed until within 10 to 12 feet, as compared with 55 feet in the present case. In these cases, no guide was furnished as to what would stand the test of "reasonable care." They suggest that the open gate is a circumstance upon which the traveler may rely but must, nevertheless, be in the exercise of ordinary care. No help is given in determining what is ordinary care under such conditions. That what is ordinary or reasonable care under such circumstances is primarily a question for the determination of the jury; but the jury must adhere to recognized principles rather than be guided by its own personal inclinations, and the court will in such cases, no less than in other negligence actions, assert its authority if a verdict is rendered by a jury upon what is less than the minimum of precautions that it has prescribed as due care. When a jury finds due care upon less than that minimum it is as equally in error as if it assesses damage at more than double the largest amount that a reasonable man would assess.

In the cases of *Hesseltine* v. *Railroad Company*, supra, *Johnson* v. *Terminal Co.*, supra, and *Witherly* v. *Bangor & Aroostook Ry.*, supra, the court prescribed principles to be observed in the determination of the due care of a traveler approaching a cross-

ing at which the gates or other warning devices provided for at that crossing are not in operation; and it is to be borne in mind that the discussion in each of the cases was not confined to the general situation of a traveler approaching a crossing. The discussion and principles laid down were applied to a situation involving the open gate and the essential facts were very similar to those in the present case.

In *Hesseltine* v. *Railroad Company*, supra, the situation of the plaintiff was not essentially different from that of the plaintiff in the present case except that he was a guest passenger. The collision occurred in the night and the gates were open. The automobile struck the engine just back of the pilot or cowcatcher. The court said that the plaintiff had an unobstructed view and should have seen the approaching train, and that his failure to do so was negligence as a matter of law. The court stated, in discussing the conduct of this plaintiff:

"Certain principles that shall govern the conduct of a traveller on the highway as he approaches an area where a railroad crosses or is crossed by a highway are and have been for years settled in this state."

"Some of them are as follows."

"The obvious peril of collision at grade crossings of railroads with common roads requires 'that the traveller upon the common road, when approaching a railroad crossing, should exercise a degree of care commensurate with the peril.'"

" 'He should never assume that the railroad track or crossing is clear. He should apprehend the danger, and use every reasonable precaution to ascertain surely whether a train or locomotive is near. He should, when near or at the crossing, look and listen, not simply with physical eyes and ears but with alert and intent mind, that he may actually see or hear if a train or locomotive be approaching.

" 'He should not venture upon the track or crossing until it is made reasonably plain that he can go over without risk of collision.' "

" 'If the plaintiff did not listen with ear and mind both he was negligent.' "

" 'Care commensurate with the peril requires the traveller upon the highway to look and listen for trains *at the very time* (italics supplied) he is approaching the crossing, and omission to take this ordinary precaution is, if unexplained, contributory negligence *per se,* as matter of law, and will bar an action for the collision even though the railroad was negligent in the premises.' "

"And ordinarily, when the traveller's view of the track is obstructed 'greater care is required in looking and listening, even to the extent, if driving, of alighting.' "

The opinion in *Hesseltine* v. *Railroad Company,* supra, was approved in *Johnson* v. *Terminal Co.,* supra. As in the present case, the plaintiff was thoroughly familiar with the crossing, likewise the crossing was at night and, as in the present case, there was a street light near the crossing with an unobstructed view of the three tracks that crossed the street. There was no gate, but trains passing over the crossing were customarily preceded by a trainman carrying a lighted lantern. Of this custom the plaintiff had knowledge from previously passing over the crossing. On the night in question, this precaution was not taken. No lights were on the engine and tender as they backed across the intersection. The court said:

"Had he looked toward his right, even when he reached the first railroad track, *he could not have failed to see* the approaching train"; (italics supplied)

In *Witherly* v. *Bangor & Aroostook Ry.,* supra, the plaintiff was familiar with the crossing. He drove his automobile at night

against an empty flat car standing motionless across a highway as a part of a train. The crossing, as the plaintiff knew, was protected by an automatic signal consisting of a red light on a wig-wag arm. This signal, which operated when a train was approaching at or on the crossing, was hidden from the sight of the plaintiff by a boxcar, a part of the train. The plaintiff drove his automobile into the side of the flat car. The court held that in spite of the absence of the usual warning signal, the plaintiff's failure to see the train was negligence as a matter of law.

The failure of the plaintiff in the present case was more pronounced for a moving train drawn by a modern locomotive is incomparably more apparent to the eye and ear than a silent, motionless flat car. The court stated the following principles as applicable to the consideration of that and similar cases:

"Literally, there was some evidence that, in approaching the crossing, the plaintiff had been careful. But this evidence is overwhelmed by opposing evidence, and the reasonable inferences deducible from established facts, that plaintiff did not exercise that due precaution which men of reasonable prudence, conscious of danger, usually exercise to avoid the incurrence of injury. The jury, therefore, had no evidence before it on which a verdict for the plaintiff could be based." (citation)

"Care and vigilance must depend on surrounding conditions, and be proportioned to known danger. 'A railroad crossing is known to be a dangerous place, and the man who, knowing it to be a railroad crossing, approaches it, is careless unless he approaches it as if it were dangerous.' " (citation)

"A railroad crossing is a place of special danger." (citation) "All railroad crossings are hazardous." (citation) "It is always train time at any railroad crossing." (citation)

"When a highway and a railroad cross at grade, the high-

way traveller should look, listen, and should stop, if there is room for doubt." (citation) "Besides, he should be attentive to make such acts reasonably effective."

"That the accident happened at night was no excuse." (citation) "A greater degree of precaution must be exercised when darkness throws a mantle over vision."

"Both authority and common sense bar him from recovery." (citation)

If it be said that the court, in prescribing the precautions to be observed by the traveler approaching a crossing with an open gate, has been exacting,—the answer is that it was observing the fundamental principles in the law of negligence that the precautions necessary in any situation depend upon the likelihood of mishap and the seriousness of results if mishap occurs. The likelihood of mishap apparent to the traveler, if the gate is open, is decreased; but the seriousness of the result, if such mishap occurs, is not diminished. It is this that has governed the court in its statement of the principles set forth.

It is my opinion that the conduct of the plaintiff, as disclosed by the evidence, falls far short of the care so unequivocally prescribed.

The majority opinion contains in its outline of the case a statement that I think might cause misunderstanding. It is said that a person approaching the crossing could not see the tracks southerly whence came the train "but a short distance until practically on the right of way." The location of the boundary of the railroad right of way does not affect the traveler's view of the track. The salient fact is that there is an unobstructed view of the track at a point 55 feet therefrom for a distance of more than 250 feet, and that such view continues until the track is reached. This is conclusively shown by the plan drawn to scale, introduced by the plaintiff.

As to the sufficiency of this distance in which to avert colli-

sion, the statement of the court in *Blanchard* v. *Railroad Company*, 116 Me., 179, 182, 100 A., 666, 667, is enlightening:

"It is in evidence that a distance of from 9 to 10 feet from the more easterly rail of the track a person could see as far northeasterly as the Bosworth Street crossing—substantially one hundred feet—and that at a point 13 feet and 7 inches from the easterly track, his view would extend 65 feet in the same direction. When Miles reached this point the front of the car would have been at least seven or eight feet from the track. If plaintiff's intestate when he reached the latter point, had looked he must have seen the train, if he had listened he must have heard the bell, which the positive evidence conclusively shows was ringing, and the rumble and other noises of the train and in either case it is inconceivable that he would have failed to warn Bridges and request him to stop, but the car was not stopped nor did he speak to Bridges."

The plaintiff was entirely familiar with the situation. He had passed over the crossing daily for years, at the same and other times of day. He knew that his view was completely obstructed until he had passed Raymond's and that thereafter his view would be completely unobstructed, that it was during his passage of 55 feet that he must make his observation and be prepared for what was disclosed. The opinion makes important the time that it would take him to go from Raymond's to the track. Two and a half or three seconds when written seems a short time. That is not so in traffic. Most negligent acts in driving and the resultant damage occur in less time. Moreover, he was not confronted with a sudden emergency. There was no situation that he could not have foreseen and been prepared for.

I would add to the statement of the case, as a material fact, that a street light was located adjacent to the crossing.

As to visibility, witnesses for both parties present when the collision occurred saw the train from varying distances as it ap-

proached and passed the intersection. Douquette, following the plaintiff, saw the train and the automobile. Francis saw it coming at a distance of 600 or 700 feet. Berry, from a considerable distance beyond Raymond's, saw the rear unlighted car of the train as it passed over the crossing. Farrar saw the train approaching and stood and watched as it went by. Boulay, witness for the plaintiff, heard the roar of the train before it came in sight. All the witnesses testified readily as to what happened, without the suggestion of any difficulty in seeing the train or other objects in the vicinity. Farrar saw the broom in the hands of the flagman.

The plaintiff's version of his looking was: "I had glanced both ways to the right and left." He did not state at what point he glanced nor which track, if either, his glance encompassed. Webster defines "glance" as "to look with a sudden, rapid cast . . . to snatch a momentary or hasty view." Such observation hardly complies with the requirements prescribed in the cited cases. The fact that he was in a covered vehicle does not serve as an excuse for his not seeing or hearing. He was required to take such precautions as would overcome any disadvantage in this respect. *Smith* v. *Me. Cent. Railroad Co.*, 87 Me., 339, 351, 32 A., 967. He was unable to state whether his window was open or closed. Such lack of knowledge indicates inattention.

His rate of speed as he approached the track was, according to his testimony, 10 to 15 miles per hour, a speed that would enable him to stop in a mere fraction of 55 feet. He says that he put on his brakes 8 or 9 feet from the train and thought he had stopped when he collided. If he had put on his brakes at any point in the first 46 feet he would not have struck the train. If the train was approaching at the rate of 15 to 20 miles per hour as estimated by different witnesses, considering that the train arrived at and passed over the crossing the length of the engine, it follows that when he arrived at Raymond's 55 feet from the track, the engine was approximately that distance from the crossing. It would seem that a man with conscious attention in that direction would

be appraised of its presence. Also, it follows that if the train had passed in front of him the distance of the length of a modern locomotive it must have been before him at least half the time while he was covering the 55 feet upon the lighted crossing and in the full glare of his headlights. It is inconceivable that he would fail to see and hear the train under such conditions unless he had allowed himself to lapse into complete inattention to his surroundings. He not only failed to make conscious effort to observe with eyes and ears, but he failed to respond to sight and sound that should have been apparent to anyone in the full possession of his senses though making no conscious effort. It makes little difference whether he looked. If he did, he saw not what he ought to see and what all others did see. Not seeing what he ought to see was negligence. Citations to this effect are unnecessary.

The opinion dismisses the question of whistle and headlight upon the engine as a conflict of evidence. I do not regard these questions as important. The presence of the train should have been apparent to the plaintiff regardless of the presence of a headlight or sound of the whistle—it was apparent to the others present. However, I do not think that the question of the headlight can be dismissed as a conflict of testimony. As to the whistle, the witnesses for the plaintiff testified that they "did not hear" the blasts. None testified that the whistle was not blown. By decree of the Public Utilities Commission, no whistle was to be blown at this crossing; but the engineer testified that when he perceived that the gates had not been lowered, he gave two blasts. Three other witnesses testified that they heard the blasts. The fact that persons within hearing did not hear may be considered as some evidence.

This cannot be said, however, as to the testimony in regard to the headlight by witnesses who did not make such observation that would disclose the headlight to their view. They testified that they "did not see" a headlight. None testified that there was no headlight and none disclosed such observation of the train as would enable them to make such a statement. Boulay first

testified that he looked at the front of the oncoming train, then changed his testimony to the effect that he did not do so. Douquette observed only the side of the train and Berry saw only the rear end of the last car. Certainly the observation of the plaintiff of what was going on about him was not sufficient to give any positive force to his statement that he did not see a headlight. On the other hand, the engineer testified that he personally manipulated the switch controlling the light, and that it was on during the entire trip. The conductor testified that he saw the light. Francis, the gateman, saw it as the train appeared 600 to 700 feet down the track, and Farrar, a disinterested bystander, had his attention attracted by the light as the train approached and stood watching it as the train passed. The testimony of the plaintiff's witnesses is negative in character in that none of them made such observation as would enable them to say whether or not there was a headlight; and such testimony should not prevail over the positive testimony of the defendant's witnesses. *Am. Jur.,* Vol. 20, subject "Evidence," Section 1187; *Crosby* v. *Railroad Company,* 113 Me., 270, 93 A., 744, L. R. A. 1915, E. 225; *Robinson* v. *Railway,* 99 Me., 47, 58 A., 57; *The Buenos Aires,* 5 Fed. (2nd), 425; *The Finn MacCool,* 147 Fed., 123.

I am of the opinion that a reasonable man would not believe there was no headlight; but I am also of the opinion, irrespective of the presence thereof, that there was abundant evidence of the presence of the train which would have been apparent to the plaintiff, if he had given proper attention to his surroundings.

In view of the precedents that I have cited, I believe the appeal should be sustained. I therefore nonconcur in the majority opinion.