Filed 5/13/14  P. v. Leith CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRAVIS WADE LEITH,<br><br>    Defendant and Appellant. | C068237<br><br>(Super. Ct. No. 09F06020) |

Defendant Travis Wade Leith claims insufficient evidence supports his convictions of possession of child pornography (Pen. Code, § 311.11, subd. (a)),[1] sexual exploitation of a child (§ 311.3, subd. (a)), and unlawful use of a concealed camera (§ 647, subd. (j)(3)(A)).  He also asserts the trial court erred when it did not on its own

---

[1]    Undesignated section references are to the Penal Code.

1

motion take permissive judicial notice of a civil complaint filed by the victim, purportedly limiting his ability to impeach the victim. In addition, he contends the court abused its discretion when it ordered him to submit to GPS electronic monitoring for the term of his probation.

We reject defendant's contentions and affirm the judgment.

FACTS

The victim, B.R., lived with her mother and defendant from when she was seven years old until she was about 15. The mother and defendant were in a relationship. Defendant was a father figure to B.R. She looked up to him, called him "dad," and loved him. The family lived in a home on Bristol Plaza Way (first home).

When B.R. was approximately 15 years old, her mother and defendant ended their relationship. B.R. and her mother moved into an apartment, but about six months later, her mother asked her to leave because she could not provide for her. Having nowhere else to go, B.R. moved back in with defendant. She has no contact with her mother.

Defendant and B.R. had separate bedrooms and bathrooms at the first home. Defendant provided her with the necessities of life as she continued high school. During this time, B.R. began dating Dustin T., forming a relationship that continued through trial.

In fall 2008, during B.R.'s senior year in high school and prior to her turning 18, defendant and B.R. moved to a residence on Kapalua Lane (second home). Defendant's girlfriend, Katrina Tougeron, moved in with them. B.R. had her own bedroom and bathroom in the second home. She celebrated her 18th birthday there in October of 2008.

B.R. had access to defendant's computer, which was located in a den or home office. She created a password-protected profile on that computer. She never gave her password to defendant. He never asked her for her password, and she never told anyone her password. Defendant had his own password-protected profile, and B.R. did not have access to his profile or know his password.

2

On May 23, 2009, B.R. was using defendant's computer to edit her senior ball photographs. At the time, defendant and Tougeron were preparing dinner. When B.R. clicked on one of the programs, she saw pictures of her as if they had been taken from the ceiling in her bedroom. At least one showed her alone; another showed her and True, standing. B.R. had never seen these pictures before, and she felt horrified at seeing them.

She called Dustin T. and asked him to come over and view them. While waiting for him to arrive, B.R. started dinner with defendant and Tougeron. She did not tell them about the pictures. When Dustin T. arrived, she and he went into the office and viewed the pictures. Dustin T. was shocked. They decided to go back to Dustin T.'s house to talk and figure out what was happening. She told defendant she was leaving to go to Dustin T.'s house. She gave him no indication she had found the pictures.

Dustin T.'s friend, Tim, was at Dustin T.'s house. After speaking about the matter, the three decided to go back to defendant's house and ask defendant if he knew about the pictures. While traveling back, B.R. called defendant and asked him about the pictures. After she told him she had found pictures from her room on the computer, there "was a pause for a while." Then defendant asked where the pictures were. She told him they were on a program on the computer.

When the trio arrived at defendant's home, defendant was sitting on the couch. B.R. showed Dustin T. and Tim the pictures, and then defendant came into the room and looked at them. When asked what happened next, B.R. said, "[It's] a blur." Sometime later that evening after B.R. had shown defendant the pictures, B.R. saw defendant in the office alone looking at different pictures on the computer. The first picture she saw him viewing appeared to be of a person nude in a shower. B.R. was shocked, and she looked away in disgust. Then she saw multiple pictures on the screen at once. She asked him what he was doing. Defendant said he was trying to find the pictures. He seemed frustrated and flustered.

3

Right after coming home, B.R. went into her bedroom and noticed a small hole next to the smoke detector on the room's ceiling. She also saw some pink insulation on the floor. B.R. commented on the smoke detector to defendant, and he went into her bedroom and started to unscrew it. He also went into her bathroom and began unscrewing the vent in that room, apparently to see if there was a camera inside.

At some point, Tim telephoned the police. Upon hearing the police were coming, defendant appeared "panicky." After the police arrived, B.R. went to Dustin T.'s house, and she never returned to defendant's house.

Elk Grove police officers responded to defendant's home around 8:48 p.m. the evening of May 23, 2009. Officer David Monti viewed defendant's computer and saw three thumbnail images of a bedroom that looked as if they had been taken by closed-circuit TV from a ceiling. Next, defendant showed Officer Monti B.R.'s bedroom. Officer Monti recognized the bed in the room as the same bed he saw in the thumbnail pictures on defendant's computer.

Officer Monti saw a grate from a ceiling air vent and smoke detector parts on the bed. There was a hole in the smoke detector that appeared to have been drilled. Using a ladder, he looked at the electrical box in the ceiling where the smoke detector would have been. There was a small gap between the drywall and the electrical box through which he could see into the attic. Shining his flashlight through the gap, he saw the male portions of audio/video cables behind the drywall. He described the cables as a black wire with yellow, red, and white connectors. The cables at that end were not connected to anything. They did not appear to be wiring that was normally used in a house.

Officer Monti went into the attic. He found the black wire he had seen from B.R's bedroom, and he followed it to the other end of the house. There, it was plugged into an adapter box. Wires from the adapter box were plugged into a surge protector. Other blue wires and cables that looked like phone jacks were also attached to the adapter box. The cables from the adapter box went into a circuit breaker or power box that was located in

4

the master bedroom where defendant and Tougeron slept. Officer Monti did not locate a camera in the attic.

Elk Grove Police Detective Kevin Papineau, an expert in computer forensics, examined defendant's computer on June 18, 2009. The computer had two hard drives; a lower drive and an upper drive.

On the lower drive, in defendant's profile, Detective Papineau found a résumé for defendant. The resume stated defendant has a bachelor's degree in computer science from Purdue University and a master's degree in software engineering from California State University, Sacramento.

Still on the lower drive, and in a folder labeled "hidden," Detective Papineau found 25 video files. All of them had been deleted, and all had been last accessed on May 23, 2009, between 8:00 p.m. and 8:17 p.m. Although all of the videos had been deleted, the data remained for nine of them, and he was able to view those nine. All nine were shown to the jury and identified by B.R. Three of them depicted B.R. masturbating in the first home, in her bedroom and bathroom. Two showed her partially nude and dressing in her first home bedroom. B.R. was under the age of 18 in these videos, and she was unaware they had been made.

Four of the videos depicted B.R. and Dustin T. having sex in B.R.'s second home bedroom. B.R. had no idea these videos were being made.

In the computer's recycler folder (also known as the recycle bin), Detective Papineau found approximately 2,000 images that were consistent with the views from the camera in the videos. They had been deleted, or moved to the recycler folder, on May 23, 2009, between 7:59 p.m. and 8:45 p.m. The images were sequential, such that if played with the appropriate software, they would create a movie.

Detective Papineau found other photos that were deleted on May 23, 2009, between 7:59 p.m. and 8:45 p.m. These photos were shown to the jury and identified by B.R. A series of photographs created in 2006 depicted B.R. masturbating with a vibrator

5

in her first home bedroom.  She would have been 15 or 16 years old at the time.**2**  B.R. was not aware a camera was taking these photographs.

A series of photos created in 2007 depicted B.R. "[m]aking out, messing around" and trying to have sex with a former boyfriend in her first home bedroom.  B.R. was 15 or 16 when these photos were taken.

Two series' of photos found in the recycler folder and created on two different occasions in 2009 depicted B.R. and Dustin T. having sex in her second home bedroom.  She was 18 years old at the time, and she had no idea these photos were being taken.

Detective Papineau also viewed the media player art cache under defendant's profile.  This is a temporary storage which the media player program uses to recall items that were played on it.  In this cache, he found photographs that had been created as files between January 13, 2007, and September 5, 2007.  B.R. identified these photos as depicting her nude, and in some instances masturbating, in the first home's bathroom and bedroom.  B.R. did not have any idea these photos were taken, and she did not take them herself or install a hidden camera in her bedroom or the bathroom.  She was under the age of 18 when these photos were taken.

On the upper drive of defendant's computer, Detective Papineau found a zip file that contained images that were consistent with having been taken from a covert camera.  The file was labeled "hidden one dot zip."  This file was created on May 23, 2009, at 8:07 p.m.  It contained a total of 2,158 files.  Some of the folders and images in this file were duplicates of others he had seen in the recycler and the videos folders.  Others were shown to the jury and identified by B.R.  They included four series' of photos apparently taken on four different days in 2009 that depicted B.R. having sex with Dustin T. in her second home bedroom.  B.R. had no idea these photos were taken of her.

---

**2**     On cross-examination, B.R. testified defendant purchased a vibrator for her when she was 15 years old.

6

Detective Papineau found other photos in the zip drive that were not contained in a specific subfolder. Some of them appeared to have been taken from a covert overhead camera. B.R. identified these photos, contained in four series', as photos of herself nude in both the first home and the second home. B.R. did not know these photos were taken of her.

The remaining photos on the zip drive were not taken from an overhead camera. Rather, most of these photos were taken by B.R. of herself in various states of dress. B.R. liked to take photos of herself. She never shared these photos with anyone nor posted them to a social network site or elsewhere on the Internet. She stored these photos on her camera and then uploaded them to her password-protected profile on defendant's computer. She did not know how these photos ended up in defendant's profile. Detective Papineau had also located these photos in the recycler folder. On cross-examination, B.R. stated she had deleted some of her own photographs at about 5:30 p.m. or 6:00 p.m. on the evening of May 23, 2009.

B.R. testified she had only a basic knowledge of computers and computer programs, which she learned from one computer class in high school. She was unfamiliar with electrical wiring and audio/video cables. She also did not know how to attach a camera to a ceiling or to transfer images from a surveillance camera to a computer. She never stored any data under defendant's profile on his computer.

On cross-examination, B.R. testified that a couple of weeks after leaving defendant's house, she met with a civil attorney, Kenneth Shepard, but at the time of trial, she did not know whether a civil action had been filed. She described to Shepard what had occurred prior to and on May 23, 2009. The lawsuit alleged defendant had recorded and photographed B.R. in the residence, and B.R. was seeking damages. She stated she, Dustin T.'s mother, and the prosecutor spoke with Shepard by phone outside the courtroom during trial, and that she heard someone mention the suit was seeking

7

$1,000,000 in damages, but she never spoke directly with Shepard about the amount of damages.

*Defense*

Defendant did not testify. His girlfriend, Katrina Tougeron, testified on his behalf. At the time she moved in with defendant into the second home, he worked outside the home as a programmer for a firm in Rancho Cordova. Both defendant and Tougeron arrived home from work about 5:30 p.m. each day. Defendant routinely spent evening hours assisting B.R. with homework or her dance lessons. After helping B.R. with her homework, defendant and Tougeron would work out or watch movies. Weekends also centered on B.R.'s schedule. Defendant would not be at the computer for hours at a time on weekends. Any time he spent at the computer at home was for his work.

The night the police came to the home, May 23, 2009, had started as an ordinary night. Tougeron prepared dinner for defendant and B.R. Dustin T. came over, and he and B.R. sat in the computer room for about 20 minutes. B.R. was not upset and did not appear to be angry. Then they left the house for an hour or so. During that time, defendant and Tougeron watched basketball on TV. Also during that time, B.R. called defendant two or three times. After the calls, defendant seemed flustered and confused, and he did not understand what B.R. had been discussing with him. But after each call, he continued to watch TV with Tougeron. He did not get up at any time.

Then B.R., Dustin T., and Dustin T.'s friend, Tim, came into the house, went straight into B.R.'s room, and closed the door. They stayed there for about 10 to 15 minutes. They came out, and Tougeron met them in the hall. B.R. was "freaked out, just shooken up [*sic*]," and she started questioning Tougeron and snapping at her. She asked if defendant had been in her room. Tougeron said he had not and had been sitting with her on the couch. B.R. brought Tougeron into her bedroom. She saw insulation on the floor and a hole in the smoke detector on the ceiling. The presence of insulation on the floor seemed unusual, and Tougeron asked B.R. about it. B.R. continued asking if

8

defendant had been in her room. She accused defendant of having a camera in the ceiling and taking pictures of her. She brought Tougeron to the computer. At about this time, defendant went into the garage to retrieve a ladder to see what was going on.

B.R. brought up a photograph on defendant's computer and told Tougeron to look at it. Tougeron started giggling because the image was about one-inch in diameter and she could not tell what it was. Dustin T. yelled at Tougeron that someone had been taking pictures and he was going to sue defendant. Tougeron called him an "ignorant bastard." Then they went into the bedroom to see if defendant had found a camera.

Tougeron testified there was not a time she could recall seeing defendant by himself at the computer that evening from the time B.R. first called him to the time the police arrived.

On cross-examination, Tougeron stated defendant was a computer engineer. He used his home computer for hours and hours at a time for work if the project required it. She stated defendant is experienced with installing lighting. He also set up the TV in their home, including connecting all of the wires, such as the DVD player to the TV. Tougeron herself has no computer expertise and is not familiar with video editing or any audio/video technology.

Tougeron also stated defendant owns two or three cameras. He transfers photos from his cameras to his computer, and he posts the photos in a shared folder for anyone to see. Defendant never let Tougeron use his computer through his profile nor did he share with her his password to access his profile.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports his convictions of the charged offenses: possession of child pornography, sexual exploitation of a child, and unlawful use of a concealed camera. We disagree.

9

Our standard of review on a claim of insufficient evidence is well known. " 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)

The standard is the same where the prosecution relies primarily on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two [reasonable] interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

A.      *Possession of child pornography and sexual exploitation of a child*

To convict defendant of possession of child pornography (§ 311.11, subd. (a)), the jury had to find defendant (1) knowingly possessed or controlled any matter or image that contained or incorporated a film, the production of which involved a person under the age of 18 years, and (2) that he knew the matter in his possession depicted a person under the age of 18 years personally engaging in sexual conduct.[3]

---

[3]      At the time defendant committed the offenses, section 311.11, subdivision (a) read: "Every person who knowingly possesses or controls any matter, representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any

10

Similarly, to convict defendant of sexual exploitation of a child (§ 311.3, subd. (a)), the jury had to find defendant knowingly developed, duplicated, printed or exchanged any image, such as a photograph or a computer-generated image, that contained any film or filmstrip that depicted a person under the age of 18 years engaged in an act of sexual conduct.[4]

The evidence sufficiently establishes defendant knowingly possessed and developed matter or images that contained a film he knew to feature B.R., a person under the age of 18, engaged in sexual conduct. Defendant knowingly possessed on his computer at least three videos showing B.R. masturbating while in her first home bedroom. Defendant also knew B.R. was under 18 years of age at the time of those videos, as he was acting, for all intents and purposes, as her father, and knew she did not turn 18 until after they moved to the second home. Defendant was the only person in the home with knowledge of computers, cameras, and wiring to set up a system to photograph and record B.R. in secret. The videos were kept in defendant's computer profile, to which neither B.R. nor Tougeron had access.

manner, any film or filmstrip, the production of which involves the use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct, as defined in subdivision (d) of Section 311.4, is guilty of a felony and shall be punished by imprisonment in the state prison, or a county jail for up to one year, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both the fine and imprisonment." (Stats. 2007, ch. 579, § 38.)

[4] Section 311.3, subdivision (a) reads: "A person is guilty of sexual exploitation of a child if he or she knowingly develops, duplicates, prints, or exchanges any representation of information, data, or image, including, but not limited to, any film, filmstrip, photograph, negative, slide, photocopy, videotape, video laser disc, computer hardware, computer software, computer floppy disc, data storage media, CD-ROM, or computer-generated equipment or any other computer-generated image that contains or incorporates in any manner, any film or filmstrip that depicts a person under the age of 18 years engaged in an act of sexual conduct."

Defendant raises a number of interpretations of the evidence to argue the jury could have concluded he was neither responsible for, nor aware of, the videos on his computer. He allegedly worked too many hours outside the home to have time to edit the videos, and someone with his computer expertise would not have attempted to delete the videos by moving them to the recycler folder, knowing they could be found there. He also asserts there was opportunity and motive for Dustin T. and B.R. to plant the videos in his computer and seek to recover damages in the civil action. None of his theories, however, refute the fact that no one who testified had his computer skills or could access defendant's profile on his computer except him, and that was where the videos were found. Suggesting Dustin T. planted the videos is mere speculation.

Even assuming everything defendant asserts is true and was heard by the jury, his claim of insufficient evidence would fail because there was contradictory evidence. It is the jury's call in such a case because it must determine whom to believe and what is true; that is, determine the facts. "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford v. Southern Pacific Co*. (1935) 3 Cal.2d 427, 429.) Sufficient evidence supports defendant's convictions of possessing child pornography and sexually exploiting a minor.

B.      *Unlawful use of a concealed camera*

To convict defendant of unlawful use of a concealed camera (a form of disorderly conduct) (§ 647, subd. (j)(3)(A)), the jury had to find defendant (1) used a concealed camera to secretly photograph a person to view that person's body or undergarments in a

bedroom or bathroom, (2) without the consent or knowledge of the person being photographed, and (3) with the intent to invade that person's privacy.[5]

Substantial evidence establishes defendant used a concealed camera to photograph B.R.'s body in her first home bedroom and bathroom and her second home bedroom without her consent and with the intent to invade her privacy. Even though a camera was not found in the second home attic, it was reasonable for the jury to conclude one had been there above B.R's bedroom, and others had been placed above her bedroom and bathroom in the first home. It was obvious the videos and pictures had been taken from a point in the ceilings. Insulation was found on the floor of the second home bedroom, suggesting someone had secretly removed a camera from that room's ceiling. Audio/video cables were found running from where the smoke detector had been, with its small hole, back across the attic to an adapter, which was also connected to other electronic wiring and cables that led to a circuit breaker or power box located in the master bedroom where defendant and Tougeron slept. B.R. never gave her consent to any of the videos and photographs found in defendant's profile, and the videos and photographs obviously were taken to invade her privacy repeatedly.

Defendant asserts the lack of cameras, and the fact the audio/video cables were not connected to any cameras, demonstrate there was insufficient evidence to convict him of unlawful use of a concealed camera. We disagree. The circumstantial evidence established photographs and videos had been taken from concealed cameras in B.R.'s

---

[5]    Section 647, subdivision (j)(3)(A), reads: "Any person who uses a concealed camcorder, motion picture camera, or photographic camera of any type, to secretly videotape, film, photograph, or record by electronic means, another, identifiable person who may be in a state of full or partial undress, for the purpose of viewing the body of, or the undergarments worn by, that other person, without the consent or knowledge of that other person, in the interior of a bedroom, bathroom, changing room, fitting room, dressing room, or tanning booth, or the interior of any other area in which that other person has a reasonable expectation of privacy, with the intent to invade the privacy of that other person [is guilty of disorderly conduct]."

bedroom and bathroom in the first home and her bedroom in the second home. B.R. was not aware any of the videos and photographs of her had been taken. Those taken in the second home bedroom were no doubt facilitated by the audio/video cables found in the attic running from the smoke detector in the bedroom, and all of the photographs and videos had been stored in defendant's password-protected profile on his computer. This evidence is very strong, and more than enough to support defendant's conviction of unlawful use of a concealed camera without the production of an actual camera.

II

*Admission of, and Impeachment on, B.R.'s Civil Complaint*

B.R. acknowledged she had met with an attorney for filing a civil action against defendant, but during her cross-examination, the trial court denied admitting into evidence a purported copy of her civil complaint on the grounds of hearsay. In closing argument, the prosecutor stated there may or may not have been a civil action. The trial court admonished the jury that, contrary to the prosecutor's statement, the civil action existed and could be considered in evaluating the evidence. The court repeated this instruction in response to a jury question about how it could consider the civil action.

Defendant contends the trial court denied him his right to present a defense. He sought to impeach B.R. by establishing the allegations in the civil complaint were without factual support, thereby showing B.R. was willing to fabricate allegations. He faults the court for not taking judicial notice of the civil complaint. Had it done so, he allegedly could have cross-examined B.R. on the complaint's specific allegations. Defendant asserts the admonition to the jury admitting the existence of the civil complaint after the prosecutor's misstatement, without also admitting the complaint into evidence by means of judicial notice, was insufficient to cure the error and allow defendant to impeach B.R. properly. He does not challenge the court's ruling denying admission of the complaint based on hearsay.

14

We affirm the trial court's rulings on the limited record provided us on this issue. Even if the trial court had erred, we would conclude the error was harmless.

A.   *Additional background information*

Defense counsel questioned B.R. during cross-examination about whether she had filed a civil lawsuit against defendant. She acknowledged speaking with her attorney, Mr. Shepard, but she initially testified she was not sure whether or not he had filed a lawsuit. Counsel asked her to read defendant's exhibit A. When counsel asked her if defendant's exhibit A was the civil complaint filed by her attorney, B.R. responded, "I don't remember in that [*sic*], but it sounds like it."[6] When counsel stated she intended to discuss some of the complaint's allegations with B.R., the prosecutor asked to approach the bench. Following the bench conference, the court announced it was sustaining a hearsay objection to defendant's exhibit A. The court did not record what transpired in the bench conference. Defendant's exhibit A was never admitted into evidence.

Counsel continued to ask B.R. questions regarding whether she had made certain factual assertions about defendant to Shepard. At one point, counsel showed B.R. defendant's exhibit B. The document had Shepard's name on the top.[7] Then the following colloquy occurred:

"Q. Looking at who filed the lawsuit, the plaintiff and the defendant, do you recognize that?

"A. Yes.

"Q. Now, looking at the damages, right here and right here?

---

[6]   The clerk's minutes describe defendant's exhibit A as a "9 page document depicting Sacramento Superior Court of California Complaint for case number 34-2010-00078380."

[7]   The clerk's minutes describe defendant's exhibit B as a "1 page document depicting - Statement of damages in B.R. vs. Travis Leith."

"A. I never seen [*sic*] this before.

"Q. Okay. I'm just asking you to look at this.

"A. Okay.

"Q. Okay.

"A. Definitely.

"Q. Are you aware how much you are suing [defendant] for?

"A. No.

"Q. You're not?

"A. Until now I have not seen this before.

"Q. Okay. Well, you are actually suing [defendant] for --

"[Prosecutor] Objection, counsel is testifying.

"[Defense counsel] [*sic*] Objection sustained.

"Q. . . . Well, the other day [the prosecutor] and you, Mr. [T.]'s mother were able to call your attorney from outside this courtroom, were you not?

"A. Correct.

"Q. And at that time you knew that you were suing [defendant] for $1,000,000, correct?

"A. I believe so, I didn't directly talk to [attorney] Ken Shepard.

"Q. So when you just sat here and said I have no idea how much I'm suing [defendant] for, that's incorrect, is it not?

"A. I really didn't know until you showed me that. I talked to him the other day, but I still don't know everything.

"[¶] . . . [¶]

"Q. . . . You know you are suing him for at least a million, right?

"A. I didn't directly talk to Ken Shepard. I heard based on other people, but I don't know if it's $1,000,000, I can't be exact on that."

16

During her closing argument, the prosecutor recalled the discussion about a civil action. She said: "There's been some mention of a civil trial. You are the criminal jurors. The civil trial is for another jury. You are here to decide simply whether the defendant is guilty of the crimes charged. [¶] You have no concern with what's happening with a pending lawsuit that may or may not exist. We don't know much about that, and that is not your concern."

Defense counsel objected to the prosecutor's statements. Outside the presence of the jury, counsel moved for a mistrial based on prosecutorial misconduct: the statement the civil action may or may not exist, and the statement the civil action was not the jury's concern. She stated the record already showed the prosecutor knew the civil action was pending. The prosecutor had spoken with B.R.'s civil attorney and had learned the action was seeking $1,000,000 in damages.

Defense counsel continued: "It has been the defense theory of this case from the very beginning, from opening through the entire questioning of this case until closing, which I have obviously not had a chance to do, that the motive for [B.R.] to accuse [defendant] of this conduct was based in large part on financial gain through a civil lawsuit.

"In some ways we are not able to question that, but we were in other ways, that testimony did come out, and for [the prosecutor] to get up in front of the jury and say two things, one, that the civil suit may or may not be in existence, and -- that's one, and two, that they are not to consider it, which is not the law.

"They absolutely can consider it as motive and bias, and the credibility of witnesses. It's clear that financial outcome in the case is something they can consider . . . ."

In response, the prosecutor stated: "I don't know exactly what I said, but I think I was referring to the fact whether -- about the jurors' knowledge in this case about whether the -- the civil trial is pending or not.

17

"Again, there was no concrete evidence presented to the jury in terms of certified documents or any other documents showing that a civil suit was in existence, and I may have misspoken, but I don't think that amounts to a mistrial.

"I think that the Court, and I can correct the record, that [B.R.] did testify that she was aware she had visited with an attorney and that papers had been filed.

"Again, what I maintain -- what I did mean to say is that we are not aware of what the status of that case is, and that trial is a separate trial from this trial, and the jurors should not be focused on the money issues in this case."

The trial court "absolutely disagree[d]" with the prosecutor's characterization of the issue. The evidence showed a civil lawsuit existed, and the existence of that lawsuit was "certainly" something the jury could consider.

However, the trial court concluded the misstatements did not rise to the level of a mistrial. It decided to, and did, admonish the jury that the civil action existed, and that it could be considered by the jury in evaluating the evidence.

The prosecutor then continued her argument: "Ladies and gentlemen of the jury, I misspoke, and the Judge has corrected that. Again, you are the finders of the fact, and anytime there's a conflict in the evidence, you can ask for a readback of testimony to figure out exactly what the facts are in this case.

"[¶] . . . [¶]

"What is important in this case is the record. And again, there is a civil trial pending in this case. [B.R.] testified that her lawyer had filed papers, that she met with a lawyer two weeks after, and again it's for -- it's up to you to consider how you want to consider that.

"[B.R.] has every right to bring a civil suit in this case. She has suffered a harm, and there are damages; but you are not the jury to decide the damages. You are the jury in this case that will decide the guilt or innocence of [defendant]."

18

During its deliberations, the jury asked the court for "[i]nstructions on how to consider the civil suit." The court replied: "In evaluating witness testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider (Instruction 226) is[:] [¶] *Was the witness's testimony influenced by a factor such as bias or prejudice, or a personal interest in how the case is decided*. [¶] The existence of the civil suit is a factor for the jury to consider in evaluating witness testimony." (Original italics.)

B.      *Analysis*

Defendant contends the trial court denied him his right to present a defense by not taking judicial notice of the complaint in B.R.'s civil action, which, he asserts, would have allowed him to cross-examine B.R. regarding that complaint's allegations. He claims the court's admonition to the jury verifying the existence of the civil action after the prosecutor's alleged misconduct was insufficient to allow defendant to impeach B.R. fully.

A court is permitted to take judicial notice of court records. (Evid. Code, § 452, subd. (d).) A court must take judicial notice of court records if a party requests it, gives each adverse party sufficient notice of the request, and gives the court sufficient information to review the request. (Evid. Code, § 453.) Nothing in the record shows defendant established a proper foundation or requested the trial court take judicial notice of defendant's exhibit A. Thus, the court had no basis for doing so, and defendant is left to argue that the court abused its discretion by not taking permissive judicial notice of defendant's exhibit A on its own motion. Where a party does not establish a proper foundation and fails to request judicial notice, he can rarely show the trial court

19

committed reversible error by not granting permissive judicial notice on its own motion. (See 1 Witkin, Cal. Evidence (5th ed. 2012) Judicial Notice, § 38, p. 148.)[8]

Defendant also did not include in the appellate record a copy of defendant's exhibit A, further complicating his burden. As a result, we have no ability to determine whether defendant's exhibit A was authenticated or whether it should have been admitted in the regular course of trial or might have been under permissive judicial notice. We must therefore assume all facts necessary to support the trial court's decision not to admit on its own motion defendant's exhibit A on the basis of hearsay and not to admit it under judicial notice, and we uphold the decision on that basis. "A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, original italics.)

The prosecutor's misstatements at argument do not compel a different result. The trial court's admonition and instruction, and the prosecutor's confession, more than cured any error that could have arisen from the prosecutor's misstatement. Both informed the jury the prosecutor had misstated the evidence, a civil action by plaintiff was ongoing, and the jury could consider that action's existence when evaluating the credibility of witnesses. The jury was well aware B.R. had spoken with an attorney soon after she discovered the pictures about bringing a civil action, and that she believed the action was

---

**8** In defendant's points and authorities supporting his motion for new trial, defense counsel asserted he had asked the court in the sidebar conference to take judicial notice of defendant's exhibit A. The prosecutor, in his opposition points and authorities, claims defense counsel made no such request during the conference. Neither attorney cited to the record to support their claims, nor did they make their claims under oath. There is thus no evidence defendant requested the court take judicial notice. It is the appellant's burden to ensure an adequate record is kept of the proceedings to allow us to consider issues raised on appeal. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532-1533.) Such sidebar conferences should always be placed on the record.

seeking possibly $1,000,000 in damages from him. The trial court's instruction and admonition clearly authorized the jury to consider evidence about the civil action in evaluating B.R.'s credibility.

Even if we determined the trial court had erred by not admitting defendant's exhibit A under any basis (assuming it to be an authenticated copy of B.R.'s civil complaint), we would find the error harmless under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) There is no reasonable possibility defendant would have received a more favorable result had defendant's exhibit A been admitted into evidence. Nothing in any alleged inconsistency between B.R.'s testimony and the purported allegations written by her attorney in defendant's exhibit A would have overcome the evidence supporting defendant's conviction. His password-protected profile, not known by anyone else in the home, contained videos and photographs of B.R. engaged in sexual conduct recorded from an overhead camera in her bedrooms and bathroom in two different houses of which she had no knowledge and for which she had granted no consent. An audio/video cable running in the attic from near B.R.'s smoke detector in her second home bedroom ceiling back to other electronic equipment above defendant's bedroom indicates some type of camera had been there, and the insulation on the bedroom floor indicates the camera had been removed recently. Defendant was the only person in the household with anything more than a basic knowledge and expertise of cameras, computers and electronics. The evidence overwhelmingly establishes his guilt, and the ability to cross-examine B.R. on differences between her testimony and defendant's exhibit A would not have changed the verdict.

## III

### *GPS Monitoring as a Term of Probation*

The trial court sentenced defendant to five years of probation with one year in the county jail. The court conditioned probation on defendant being subject to GPS

21

monitoring for his probation term.  Defendant contends the court abused its discretion by imposing this condition.  He claims the restriction bears no reasonable relationship between him and his offenses.  He scored in the low-risk category of potentially reoffending on the Static-99R test, and he has no prior criminal history.  He asserts he is not a high-risk sex offender and there is no evidence the public was in any risk on his account.  We conclude the trial court did not abuse its discretion.

"The classic formulation of a trial court's power to impose probation conditions is taken from *People v. Lent* (1975) 15 Cal.3d 481, 486, where our Supreme Court stated: 'A condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." [Citation.]' " (*People v. Balestra* (1999) 76 Cal.App.4th 57, 65, fn. omitted.)

The probation condition is valid because it relates to the crimes for which defendant was convicted, and it assists in requiring or forbidding conduct that is reasonably related to future criminality.  Section 1210.7 authorizes continuous electronic monitoring of probationers, provided the monitoring has as its primary objective "the enhancement of public safety through the reduction in the number of people being victimized by crimes committed by persons on probation." (§ 1210.7, subd. (b).)  In defendant's case, the device allows the probation department to monitor his compliance with his other probation conditions, including attending counseling, not being in the presence of any minor or groups of minors under the age of 18 without approved supervision, not knowingly engaging in volunteer work involving minors, and not having any contact with B.R.  All of these conditions are designed to protect public safety by ensuring defendant does not use his extensive computer skills to victimize unsuspecting persons, especially minors, while on probation, and the GPS monitoring significantly aids in their enforcement.  The court did not abuse its discretion in imposing the condition.

DISPOSITION

The judgment is affirmed.

      NICHOLSON     , Acting P. J.

We concur:

      BUTZ         , J.

      MAURO       , J.