[No. D013604. Fourth Dist., Div. One. Dec. 9, 1991.]

In re MISAKO R. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
CHAI R., Defendant and Appellant.

**COUNSEL**

Miriam R. Kennedy, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and John E. Philips, Deputy County Counsel, for Plaintiff and Respondent.

John Y. Tremblatt, under appointment by the Court of Appeal, for Minors.

## OPINION

**KREMER, P. J.**—Chai R. appeals an order establishing long-term foster care for her children Misako and Ty[1] and terminating reunification services for Misako, Ty, and Minna. We affirm.

### FACTS AND PROCEDURE

Chai R. was born and raised in Korea. She is illiterate in both English and Korean, although she can write her name in Korean. She completed only two or three years of schooling in Korea. Tests by a court-appointed psychologist indicated she is mildly retarded.

Chai's husband Michael R. is the father of children Misako and Ty. The four lived in Okinawa until Michael R. was discharged from the Air Force in 1986. Chai did not want to leave and was not caring for the children, so Michael R. returned to the United States with Misako and Ty. Military authorities sent Chai to join them in Texas 10 months later. Chai was pregnant with Minna when she arrived. Minna's father is Darryl M., a Marine. In October 1987, Chai and the three children left Michael R. in Texas to join Darryl M. in California. She did not contact Michael R. for six months.

On October 1, 1989, while in California, Chai directed Darryl M. to discipline her children. He did so by striking them with a wire hanger, electrical cord and belt. On October 4, 1989, the San Diego County Department of Social Services (Department) filed petitions on behalf of Misako R., pursuant to Welfare and Institutions Code section 300, subdivision (b)[2] and on behalf of Ty and Minna pursuant to section 300(b) and (j). The petitions alleged Darryl M. exposed Misako to excessive discipline and damage including bruises and lacerations resulting from his striking him with a belt. On October 16, 1989, the court found by clear and convincing evidence that the allegations were true.

On October 31, 1989, following a dispositional hearing, the court declared Minna a dependent child of the court, under the care, custody and control of the Department pursuant to section 300(b) and (j). The court ordered physical custody be removed from the parents, but ordered Minna be placed with the mother. The court also issued a reunification plan directing the mother to,

---

[1]Ty was also called "Peter" at various points in the hearings.

[2]All statutory references are to the Welfare and Institutions Code unless otherwise specified. When referring to statutory subparts of section 300, we omit repetition of the word "subdivision."

inter alia, actively participate and cooperate with In-Home Services and Union of Pan Asian Communities Counseling and Treatment Center (UPAC) in learning new parenting skills. The reunification plan directed Chai to:

"Obtain and maintain the same residence for at least three months.

"Demonstrate an ability to meet the basic needs of the minor to include food, clothing, and shelter.

"Maintain your home in a safe and sanitary condition.

"Notify the Department of Social Services social worker of any person(s) sharing your residence.

"Keep the . . . social worker advised of your current home address and telephone number . . . . Immediate notification to the social worker is required whenever your address/telephone number changes.

"Provide the . . . social worker with proof of your financial ability to provide for your child(ren) from a legal source of income. . . ." It also directed Chai to enter into individual therapy if the Department could find a local Korean-speaking therapist.

On November 20, 1989, following another dispositional hearing, the court declared Misako a dependent child of the court pursuant to section 300(b). The court removed physical custody of Misako from the mother pursuant to section 361, subdivision (b). Misako was placed in a licensed foster home.

Also on November 20, 1989, Ty was declared a dependent child of the court pursuant to section 300(b) and (j). Ty was detained with the mother.

In December 1989 and February 1990, a Korean-speaking counselor carried out a psychosocial evaluation. The counselor's report recommended Chai volunteer in an educationally oriented day nursery to observe and learn parenting skills first hand. It also recommended Chai attend English as second language classes and learn how to use public transportation.

On May 22, 1990, a psychologist, with the help of an interpreter from UPAC, carried out a psychological evaluation. Although the language barrier created some difficulties for the psychologist, she was able to employ several nonverbal tests from which she was able to make her conclusions. The psychologist had extensive experience testing patients from a broad variety of Asian cultures, including Koreans. The psychologist concluded

Chai is mildly retarded and would have great difficulty learning a second language. The psychologist also concluded Chai "is not able to function as a safe, single parent to her children without a live-in, competent adult." The report indicated a need for significant psychological intervention on behalf of the children as they are at high risk of:

"(1)  fetal alcohol effects

"(2)  chemical dependency

"(3)  the cycle of abuse with their offspring

"(4)  learning disability and school failure

"(5)  antisocial behavior."

Subsequently, a social worker with the aid of the same UPAC interpreter/counselor[3] visited with Chai once or twice each week, a total of three or four times. They attempted to teach her basic skills such as shopping, cooking, paying bills, using public transportation and proper methods of disciplining her children. A public health nurse also visited the home to check on the health and welfare of the children.

Chai frequently moved from motel to motel. She did not always inform the Department. When Chai moved from a motel in Escondido to a motel in Oceanside, the social worker continued to meet with her without the aid of the UPAC counselor/interpreter. Chai was unwilling or unable to learn. She did not complete a parenting class as directed by the social worker.

Much of Chai's food was prepared and delivered by volunteers from local churches who also helped her pay bills and read correspondence. Eventually the church was unable to continue providing for Chai's daily needs.

When Minna's father, Darryl M., gave Chai money, she would buy "trinkets" or junk food. Darryl M. testified he tried unsuccessfully to teach Chai how to shop. He said Chai seemed unable to learn. There was no food stored in the home. She provided no structure for mealtimes—when there was food they ate. The children's clothing was dirty and ill-fitting. Ty and Misako were absent from school for long periods.

Chai visited the San Diego Regional Center for the Developmentally Disabled (Regional Center) twice but was wholly uncooperative as she believed it was a place for treating "crazy person[s]."

---

[3]Chai later complained that the interpreter "didn't do it right" and a different interpreter was used at the subsequent hearings.

At one point Chai disappeared for three days. Chai expressed an intent to take the children to Texas to rejoin Michael R. However, Michael R. was in a new relationship with a woman who had seven children. The social worker concluded Chai's expectation to rejoin Michael R. was unrealistic as Michael R. was not interested in taking Ty and Misako back. Several attempts by the Texas Department of Human Services to contact Michael R. were unsuccessful as he never responded to any correspondence.

During the meetings with the social worker, Chai had difficulty understanding what she was being told. However, the social worker would check with her to see what she did understand and get help from the UPAC counselor/interpreter on the problem areas. The social worker concluded Chai was incapable of learning basic parenting skills despite being given in-home services.

A contested six-month review hearing commenced on June 5, 1990. The court found by clear and convincing evidence that return of the children to the mother would create a substantial risk of detriment to their emotional and physical well-being. The court further found reasonable services had been provided or offered to the parents which were designed to assist them in overcoming the problems which led to the initial removal of the minors. The court ordered continuation of the services pursuant to the plan which it found to be reasonably fashioned. Ty and Misako were placed together in a licensed foster home. Minna was placed with her paternal grandmother in Ohio.

Chai did not appear at the 12-month review hearing on November 27, 1990, although her attorney was present. The court found there was not a substantial probability Misako or Ty would be returned to either parent. The court also found clear and convincing evidence Misako and Ty were not adoptable and ordered long-term foster care for them. The court found a substantial probability Minna would be returned to her father's custody and continued placement with the paternal grandmother in Ohio.

Chai appeals these orders.

## DISCUSSION

## I

### REASONABLE SERVICES WERE PROVIDED

The mother, Chai, contends there is insufficient evidence to support a finding reasonable services were provided.

■ "[W]henever a minor is removed from a parent's . . . custody, the juvenile court shall order the probation officer to provide child welfare services . . . to the . . . parents . . . for the purpose of facilitating reunification of the family . . . ." (§ 361.5, subd. (a).) Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual. (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458 [234 Cal.Rptr. 84]; *In re Edward C.* (1981) 126 Cal.App.3d 193, 205 [178 Cal.Rptr. 694].)

■ In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *In re Luwanna S.* (1973) 31 Cal.App.3d 112, 114 [107 Cal.Rptr. 62]; *People* v. *Belcher* (1961) 189 Cal.App.2d 404, 407 [11 Cal.Rptr. 175].) ■ " ' "[W]hen two or more inferences can reasonably be deduced from the facts," either deduction will be supported by substantial evidence, and "a reviewing court is without power to substitute its deductions for those of the trial court." [Citations.]' [Citation.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317 [601 P.2d 549].)

■ Chai contends the services offered were not reasonable given her intellectual deficiencies and language difficulties. In particular, she complains of the Department's failure to obtain an earlier psychological evaluation, an evaluation which revealed her intellectual limitations, and to make an earlier referral to the Regional Center. To support her argument the reunification services were inadequate here, Chai relies on the decision in *In re Victoria M.* (1989) 207 Cal.App.3d 1317 [255 Cal.Rptr. 498].

In the *Victoria M.* decision, a case involving the termination of parental rights under Civil Code section 232, the court reversed the termination because there was insufficient evidence to support the finding that reasonable reunification services had been offered. The mother in *Victoria M.* had limited mental capabilities. The appellate court found the record was "clear that no accommodation was made for [the mother's] special needs in providing reunification services" although "[e]veryone was aware that [the mother] had mental limitations" from the outset. (*In re Victoria M., supra,* 207 Cal.App.3d at p. 1329.) In *Victoria M.,* the Department had not referred the mother to the Regional Center. The court concluded "the rights of a developmentally disabled parent may not be terminated without first assessing whether the services offered by the state through regional centers may

enable the family of a disabled person to remain intact. [¶] . . . Once it has considered [possible alternatives], it is within the court's discretion to order further services, if appropriate, or to conclude that further services would not be fruitful. [Citation.]" (*Id.* at p. 1331, fn. omitted.)

In contrast to the *Victoria M.* case, the record here, when viewed in the light most favorable to the respondent, indicates everyone was not aware Chai had mental limitations. The psychosocial evaluation performed by a Korean-speaking counselor in February 1990 did not identify Chai as mentally retarded although it did suggest a "thorough evaluation of her physical and mental impairment from a prolonged alcohol abuse should be made." Such an evaluation was conducted in late May 1990 and revealed Chai was mildly retarded. The Department then referred Chai to the Regional Center in June 1990. A social worker for the Regional Center attempted to do a social assessment of Chai on June 26, 1990, but Chai was "unyielding in her insistence that she did not need Regional Center services and did not have time to answer questions or participate in evaluations." Ultimately, the interview on June 26 was terminated. The Regional Center gave her a booklet explaining Regional Center services and encouraged her to call in the future if she felt she needed additional services. Chai began utilizing the Regional Center's services in August 1990.

Chai, who did not keep an appointment at the Regional Center, complains she was misinformed that the Regional Center served mentally infirm patients. The record is clear this information came from a Korean friend of Chai's and not from the Department. There is no indication in the record that the Department misled Chai as to the nature of the services provided by the Regional Center. Indeed, the record indicates that when Chai went to the Regional Center, the personnel there attempted to correctly inform her of their services and encouraged her to utilize them.

As to Chai's language difficulties, the record shows the Department utilized interpreters some of the time to communicate with her. At other times the social worker talked to Chai without an interpreter. Chai spoke some English. The social worker testified Chai spoke enough English so that she could be understood. The counselor who interviewed Chai at the Regional Center stated she "seems to know quite a bit of the English language and was able to make her point in English as well." This record indicates the Department was aware of Chai's language difficulties and used interpreters when necessary.

Chai also complains about the Department's reliance on church members to help her without investigating the capabilities of the church members to

do social work. She contends "[s]pecial expertise was necessary to help [her] learn to function on her own." The church members were but one resource provided to the mother. In addition, the mother was aided by the social worker, a public health nurse, the Regional Center, In-Home Services, UPAC and a psychologist. The Department through these agencies provided Chai with professional help to learn skills necessary to effectively care for her children. Far from evidencing inadequacy, the record shows the Department commendably utilized a wide range of services including those of church members in the community.

Finally, Chai complains the Department did not provide enough services, e.g., that the visits of the social worker and the UPAC counselor should have been more frequent. In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances. We conclude here the mother was provided with the assistance of numerous people and agencies and the services provided were reasonable under the circumstances.

II

STANDARD OF PROOF

Chai urges this court to remand for the court to clarify the standard of proof it applied. She argues the statute requires a finding of reasonable services must be supported by clear and convincing evidence. We do not agree.

Section 366.21, subdivision (f) provides:

"At the review hearing held 12 months after the initial dispositional hearing, the court shall order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk or detriment to the physical or emotional well-being of the minor. The probation department shall have the burden of establishing that detriment. The court shall also determine whether reasonable services have been provided or offered to the parent or parents which were designed to aid the parent or parents to overcome the problems which led to the initial removal and continued custody of the minor. . . ."

Thus, in the context of the 12-month review hearing, the statute does not specify the standard of proof the court must apply when determining whether

reasonable services were provided. "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.)

When a hearing is to be held pursuant to section 366.26 to terminate parental rights, section 366.21, subdivision (g)(1) requires clear and convincing evidence that reasonable services have been provided or offered to the parents. In the instant case, parental rights were not terminated. The permanent plan ordered by the court for Misako and Ty was long-term foster care. For Minna, the court ordered continued placement with the paternal grandmother and continued reunification services provided to the father. There is no legal reason preventing Chai from petitioning the court pursuant to section 388 for additional services or return of the children.

Chai's reliance on *In re Katrina C.* (1988) 201 Cal.App.3d 540 [247 Cal.Rptr. 784] is misplaced. *Katrina C.* involved a dispositional order transferring custody from one parent to the other, which order issued shortly after the effective date of revision to section 361 making clear that the higher standard of proof applied. As the record was silent and case law had been in flux, the appellate court remanded to allow the trial court to articulate the standard applied. Here not only is the standard preponderance of the evidence but there is no indication the court might have applied an incorrect standard. No reversal is required on this ground.

### DISPOSITION

The order is affirmed.

Wiener, J., and Todd, J., concurred.