Filed 6/19/15  Richardson v. Bd. of Administration, Cal. Public Employees' Retirement System CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SHELIA RICHARDSON,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>BOARD OF ADMINISTRATION, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM,<br><br>    Defendant and Respondent. | C069589<br><br>(Super. Ct. No. 34-2008-80000060-CU-WM-GDS) |

In this appeal, we determine whether substantial evidence supports the trial court's judgment that plaintiff Shelia Richardson is not entitled to receive disability retirement benefits because she is not incapacitated to work.  We conclude substantial evidence supports the trial court's decision, and we affirm.

FACTS

Plaintiff began working for the Department of Motor Vehicles (DMV) in 1987.  She worked in various positions over the years, and was promoted to be a driver safety

1

officer in 1998. In that position, plaintiff conducted administrative hearings and issued written decisions.

In 1996, she suffered injuries from two separate car accidents. The first occurred in January when her car was broadsided by another car. She hurt her lower back, and she missed approximately four months of work. The second accident occurred in July of that year. She was conducting a driving test, and a car rear-ended her car. She suffered injuries to her head, neck, back, and knee. She missed work for approximately a year and a half.

Plaintiff returned to work in 1998 at a San Francisco DMV office. She transferred to the Sacramento field office in 2000, where she continued to work until 2003. From the time plaintiff returned to work in 1998, she was able to perform the duties of a driver safety officer until 2003, although she stated she struggled with the physical aspects of the job.

In October 2003, plaintiff was involved in a heated discussion with a coworker who plaintiff believed was harassing her. After the conversation, her supervisor asked her to come into his office. According to plaintiff, he forced her against the door and held the door closed with his hand. He was "in [her] face," and he screamed and yelled at her. She received a disciplinary memo as a corrective memo to discipline her for discourteous treatment of an employee and a supervisor. Receiving the memo upset plaintiff, and she refused to sign it. She felt she had been wrongly punished. After the incident, plaintiff became depressed, and she experienced nightmares and panic attacks during the night.

In November 2003, plaintiff's doctor took her off work.

That same month, plaintiff applied for reasonable accommodations from the DMV. She asked to continue working as a driver safety officer, but in the DMV's Sacramento headquarters. She stated her disability was a hostile work environment in her current office, harassment, stress, and retaliation. Plaintiff admitted she did not base her

request on any physical complaints or conditions. She was ready, willing, and able to return to her position as a driver safety officer so long as she was not required to work in the same office of her supervisor and coworker. Reports from a psychologist and a psychiatrist confirmed that although she had symptoms of major depression, she was able to perform her job in a different office.

In March 2004, the DMV denied plaintiff's request for accommodations. There were no opportunities for plaintiff to move to the headquarters office. Also, the supervisor with whom she had had the incident no longer worked for the DMV. The DMV ensured plaintiff her current office would be monitored to keep it free from harassment and discrimination if she returned to work there.

By application dated October 2004, plaintiff applied to defendant California Public Employees' Retirement System (PERS) for disability retirement. She alleged she suffers from orthopedic, neurologic, and psychological disabilities. Specifically, she claimed she suffers from chronic pain in her neck, back, right hip, both legs, and her head. It affects her ability to walk, sit, and stand, perform any type of repetitive movements such as bending or lifting, and perform normal household chores. Plaintiff also alleged she suffers from migraines. Her migraines can incapacitate her in each instance for several days. In addition, plaintiff claimed she suffers from major depression and posttraumatic stress syndrome, arising from the incident with her supervisor. She must take psychotropic medication in order to function daily. Plaintiff did not allege in her application that she suffers from fibromyalgia.

PERS staff denied plaintiff's application for disability retirement in 2006. Plaintiff appealed the denial to the PERS Board of Administration (PERS Board), and the matter was heard by an administrative law judge (ALJ).

After hearing plaintiff's testimony and medical testimony from both sides, the ALJ in a proposed decision concluded plaintiff was not permanently disabled and thus not

3

entitled to disability retirement. The PERS Board adopted the ALJ's proposed decision as its own, and later denied plaintiff's request for reconsideration.

Plaintiff petitioned for a writ of mandate from the superior court. After conducting a hearing and reviewing the administrative record, the trial court denied the petition. It determined the weight of the evidence did not establish plaintiff was permanently disabled for purposes of receiving disability retirement benefits.

Plaintiff appeals, and she contends the trial court's judgment is not supported by substantial evidence.

DISCUSSION

I

*Standard of Review*

"A public employee has a fundamental vested right to a disability pension if he or she is in fact disabled. (*Quintana v. Board of Administration* (1976) 54 Cal.App.3d 1018, 1023. . . .) Accordingly, the trial court was authorized to apply its independent judgment as to the weight of the evidence. (*Id*. at p. 1021.) On appeal, we 'need only review the record to determine whether the *trial court's* findings are supported by substantial evidence.' (*Id*. at p. 1024, italics added; [citation].)" (*Beckley v. Board of Administration etc.* (2013) 222 Cal.App.4th 691, 697.)

"In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [judge or] jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court."

4

(*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; see also *Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [same principles apply to court trials].)

II

*Substantial Evidence*

Plaintiff bore the burden of proving at trial by preponderance of the evidence and based on competent medical opinion that she had a physical or mental disability of permanent or extended and uncertain duration that substantially incapacitated her from performing the usual and customary duties of her job. (Gov. Code, §§ 20026, 21154, 21156; *Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876.)

Weighing the evidence, the trial court determined plaintiff did not meet this burden. We conclude substantial evidence supports the trial court's judgment.

Plaintiff's expert witnesses testified she was permanently disabled and unable to perform her job due to major depression, fibromyalgia, chronic pain, and posttraumatic stress disorder.

The Board introduced substantial, credible evidence by medical experts who disagreed with plaintiff's experts. The Board's expert witnesses were Dr. Frank C. Palumbo, an orthopedist; Dr. Steven L. McIntyre, a neurologist; and Dr. Donald H. Stanford, a psychiatrist. The Board and the trial court relied upon the evidence and opinions presented by these doctors, and their opinions are sufficient evidence on which we sustain the trial court's decision.

Dr. Frank C. Palumbo, a board certified orthopedic surgeon, performed an independent orthopedic examination on plaintiff in 2006. Plaintiff complained of migraines; neck pain to her right shoulder; pain in her right hand radiating up to her right shoulder; soreness in her right elbow at times; pain in her entire back, especially the right lower back radiating to the sole of her right foot; right knee pain; ankle swelling; and panic attacks. The neck pain, back pain, and migraines had been present for years. In a

5

written report, Dr. Palumbo stated he "could not find any true objective findings to substantiate [plaintiff's] multiple subjective musculoskeletal complaints." Plaintiff's "general movement about the examining room was felt to be nonorganic from a musculoskeletal point of view . . . ." Dr. Palumbo believed that during the examination, plaintiff "was not putting forth her best effort and [he] felt there was gross exaggeration of musculoskeletal complaints." He concluded plaintiff was not substantially incapacitated from performing her job.

Dr. Palumbo further explained his findings at the administrative hearing. Plaintiff's cervical spine showed some generalized tenderness over the back portion of her neck and right shoulder, but there was no swelling, redness, or muscle spasm present. The lack of a muscle spasm, with pain allegedly spread over such a wide area, rendered the examination suspect. He found no hard "knots" that he would have expected to find in someone who alleged unremitting spasms over a number of years. Also, the lack of tenderness on plaintiff's left side did not fit any specific organic pattern, i.e., a problem whose origin could be found objectively.

Dr. Palumbo tested plaintiff's grip strength. The test showed plaintiff's right side was weaker than her left side, but Dr. Palumbo had an impression that plaintiff was not giving her full effort when he tested her right side. He had a similar impression when testing plaintiff's range of motion in her cervical spine. Her extension and bending was normal, but she did not rotate her neck to the right as well as to the left. Her movements in the test were slow and jerky, which gave Dr. Palumbo the impression she was not actively putting forth her full effort. A jerky motion in that test is not, in Dr. Palumbo's experience, a usual organic response from someone who has a true pathology.

Dr. Palumbo tested plaintiff's muscle strength in her upper extremities down to her hands. Her strength was normal and equal bilaterally, and she had no muscle atrophy. Normal muscle strength was inconsistent with someone who had suffered from chronic

6

pain in those areas. Plaintiff also walked with an unsteady and labored type of gait; a gait he would not expect to see in someone experiencing a specific problem in an extremity.

When Dr. Palumbo examined plaintiff's mid and lower back, he noticed "marked guarding" as plaintiff moved her back, even though there was no muscle spasm present. When plaintiff showed him how far she could bend forward, a distance of 19 inches separated her fingertips from the floor, a "sizable difference."

Dr. Palumbo tested plaintiff's lower extremity movements by having her lay on her back and raise her leg as high as she could while keeping her knee locked. She could raise it only 20 degrees. He compared this to when she was in a sitting position, and was asked to straighten the knee up. In that circumstance, she was able to raise the leg to 90 degrees. This discrepancy showed him there was "a very voluntary effort in keeping me from going ahead and raising that leg up" when she was lying down.

Ultimately, Dr. Palumbo could not make any objective findings to substantiate plaintiff's subjective complaints. As a result, he had no grounds to say plaintiff was incapacitated from performing her job.

Dr. Steven L. McIntyre, a board certified neurologist, performed an independent neurological examination on plaintiff in January 2006. He examined plaintiff for her complaints of migraine headaches, pain along the entire right side of her body, and associated cervical pain since her 1996 car accident. Plaintiff reported the pain was so severe at times she could not hold her torso erect, falling forward involuntarily at the waist " 'like a wet noodle.' "

In a written report, Dr. McIntyre concluded that from a neurological perspective, plaintiff was not incapacitated and was able to complete her job duties. There were no specific functional limitations related to her headaches. The headaches resulted from a cervical strain. They were not consistent with migraines in duration and location. He believed plaintiff would have fewer headaches if she used a prophylactic agent. He

wrote: "There are not specific functional limitations on a neurological basis. There were no deficits or objective findings on the neurological examination."

At the hearing, Dr. McIntyre explained his report. Plaintiff's complaint of not being able to hold up her torso was, "quite frankly, unusual, atypical, [and] would not lead one to a neurological diagnosis." Her description of headaches affecting her entire head that came and went during a day was inconsistent with migraine headaches. Migraine headaches typically involve one hemisphere of the head and normally do not come and go daily.

When Dr. McIntyre examined plaintiff's spine, he did not detect any bony deformity or paraspinal muscle spasm. Her cervical movements were fluid. She had some tenderness on palpation, but this occurred in a nonspecific pattern. Her ranges of motion were mostly normal. He was not able to find any signs suggesting plaintiff had significant cervical pathology.

Dr. McIntyre also found no cognitive disorder, no abnormal muscle control, no abnormal nerve sensation, and, based on plaintiff's reflexes, no indication of a central brain or spinal cord disorder. In short, he did not find plaintiff had a neurological disorder that substantially incapacitated her from performing her job.

Dr. Donald H. Stanford performed an independent psychiatric evaluation of plaintiff in 2006. At the time of their meeting, plaintiff said she would like to work, but she did not feel psychiatrically ready or capable of working because of anxiety, memory problems, confusion, depression and continuing pain. Her psychiatric impairment also involved her inability to think and concentrate. Dr. Stanford diagnosed plaintiff as possibly having depressive disorder, not otherwise specified, possibly with bipolar features. He believed plaintiff was substantially incapacitated from performing her job, but he also believed the incapacity was temporary, and plaintiff could return to work within 6 to 12 months with treatment.

8

Dr. Stanford conditioned his opinion on discrepancies between plaintiff's description of her problems and his own clinical observations. Plaintiff's clinical presentation was not consistent with her complaints. Contrary to her descriptions, plaintiff appeared to be concentrating and maintaining her thought quite well and capable of logical and detailed speech. Also, plaintiff appeared to be suffering from sleep apnea, which would account for her complaints of difficulty breathing while sleeping, exhaustion, disrupted sleep, and diffuse cognitive impairments. He believed her existing medical and mental health reports were superficial, oversimplified, and simply documentation by various physicians. He also believed she was likely exaggerating.

By letter dated March 30, 2006, Dr. Stanford supplemented his earlier report. He stated the reports from Drs. McIntyre and Palumbo helped clarify the discrepancies between plaintiff's subjective complaints and his objective findings. These reports changed his earlier opinions of plaintiff. He now believed plaintiff, if she were motivated to work, could perform her usual work, albeit with a continuing need for psychological treatment as he had earlier recommended.

Dr. Stanford expanded on his changed opinion at the administrative hearing. In his initial evaluation, he gave plaintiff the benefit of the doubt of having a basis for her complaints, "albeit with exaggeration." He also was not convinced she had received adequate psychiatric treatment. However, after learning Dr. McIntyre had not found any cognitive problems with plaintiff, his doubts about her case became stronger than his wish to give her the benefit of the doubt, and so he reversed himself. He believed plaintiff could work.

This review of the evidence demonstrates the trial court's decision finding plaintiff not to be permanently incapacitated from working is supported by competent medical evidence. Plaintiff was able to perform her job up until October 2003, and no objective findings supported her alleged orthopedic, neurologic, and psychological deterioration

9

after that time. She may have been suffering from major depression, but it did not incapacitate her from working if she received adequate treatment.

Plaintiff did not allege fibromyalgia as a basis for receiving disability retirement. She also did not inform Dr. McIntyre that fibromyalgia was a primary issue. However, even if she had alleged fibromyalgia, there was substantial evidence to support a trial court ruling that the disease did not incapacitate her from working. One of plaintiff's expert witnesses, Dr. Jose R. Sanchez, a pain specialist, examined plaintiff in 2008 three weeks before the administrative hearing, and he diagnosed her with possible fibromyalgia. He testified he would have diagnosed fibromyalgia in her since 1996, following her two car accidents. However, no one disputes plaintiff fully performed the duties of her job from 1998 through October 2003, demonstrating that if she had fibromyalgia, it did not incapacitate her. Even Dr. Sanchez, while concluding plaintiff has axial and diffuse body pain, stated there "are no really [*sic*] trigger points elicited on exam to clinch the diagnosis of fibromyalgia . . . ." This was sufficient evidence on which the trial could determine fibromyalgia did not incapacitate plaintiff from performing her job.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to defendant PERS. (Cal. Rules of Court, rule 8.278(a).)


                                                NICHOLSON       , Acting P. J.


We concur:


      HULL             , J.


      ROBIE           , J.

10